[Civ. No. 48952. Second Dist., Div. Four. Mar. 29, 1977.]

INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, AFL-CIO, Plaintiff and Appellant, v.
BOARD OF HARBOR COMMISSIONERS OF THE CITY OF LONG
BEACH et al., Defendants and Respondents.

**COUNSEL**

Silver & McWilliams and Edwin Silver for Plaintiff and Appellant.

Leonard Putnam, City Attorney, Robert G. Austin and George A. August, Deputy City Attorneys, Grisham, Vandenberg, Nott, Conway & Cannon, Jack E. Grisham and Roland E. Bigonger for Defendants and Respondents.

**OPINION**

**KINGSLEY, Acting P. J.**—Plaintiff appeals from an order of dismissal (Judgment, Code Civ. Proc., § 581d) of its first amended complaint (complaint) after an order sustaining, without leave to amend, a demurrer to that complaint. We affirm the order (judgment).

Defendant City of Long Beach holds in trust the tidelands herein involved. In 1963, acting through defendant board of harbor commissioners, it entered into a contract with defendant Long Beach Oil Development Company (Development) for the production of oil from those tidelands.[1] The contract required Development to conduct all operations under the contract at its own expense. Development was obligated to sell all oil and gas produced by its operations and to pay to the city, as compensation for its rights under the contract, the value of all oil and gas so sold, after deducting its costs of operation and 9 percent of the net profits.[2]

---

[1]Long Beach Oil Development Company is a consortium composed of defendants Signal Oil & Gas Company, Standard Oil Company of California, Humble Oil & Refining Company, Continental Oil Company and C. M. Oil Company. The action joined all of the constitutional companies as defendants. As have the parties, we refer to Development as the defendant, including in that reference all of the defendant oil companies.

[2]We set out the pertinent parts of the 1963 contract in the appendix to this opinion.

Thereafter, in 1974, Development entered into a contract with defendant Yorba Linda Electric (Yorba Linda) for the construction of what are described as "Electrical Distribution Facilities" for use in connection with Development's operations under the 1963 contract. The complaint alleges that Yorba Linda's bid contemplated that it would pay its employees less than the prevailing wage for such work and that Yorba Linda has paid such lesser wages to its employees.

Plaintiff, suing as a labor union on behalf of its members, sought the following relief:

1. A declaration of rights to the effect that construction, alteration, demolition and repair work called for and anticipated by the December 1963 drilling and operating contract, and calls for bids and contracts arising thereunder, including the work specified in the October 10, 1974, invitation or call for bids, and work of similar nature is "public work" and subject to the requirements of the Labor Code of the State of California, section 1720 through section 1775;

2. For special damages according to the plaintiff's proof;

3. For general damages in the amount of $100,000;

4. For a preliminary and/or permanent injunction, restraining the defendants, their representatives, employees, agents and all persons acting by, through or in concert with the defendants from contracting, doing, attempting or causing to be done, either directly or indirectly, any "public work" as defined in California Labor Code section 1720 and/or work otherwise specifying payment of prevailing wages, where in fact wages paid to the workmen will be at less than the prevailing rate of wages in the locality;

5. For an order of this court directing that the defendants show cause, if any they have, at a time and place to be fixed by the court, why a permanent injunction should not issue as hereinabove prayed for;

6. For costs of suit incurred herein; and

7. For such other and further relief as to the court seems proper.

It is the seeming theory of plaintiff's complaint that the 1963 contract constituted a contract for "public work" within the meaning and effect of

sections 1720-1775 of the Labor Code, that the employees of Yorba Linda are employees within the meaning of those sections, and that the various defendants have been guilty of a violation of the statutory duty under the cited sections of the Labor Code to pay prevailing wages.

In this court, defendants seek to sustain the trial court's orders on the following grounds:

(1) That the 1963 contract did not involve a "public work";

(2) That development is not being paid out of "public funds";

(3) That plaintiff has no standing to sue;

(4) That the remedies for violation of the cited Labor Code sections is exclusively that provided in those sections. In addition, the city and the board claim immunity by virtue of the governmental tort act.

I

Insofar as the complaint seeks monetary damages against the city and the board, the demurrer was properly sustained. The complaint does not allege any compliance with the claims provisions of the governmental tort act.

II

The pertinent provisions of the Labor Code are as follows:

Labor Code, section 1720: "As used in this chapter 'public works' means:

"(a) Construction, alteration, demolition or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority.

"(b) Work done for irrigation, utility, reclamation and improvement districts, and other districts of this type. 'Public work' shall not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages.

"(c) Street, sewer or other improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether such political subdivision or district operates under a freeholder's charter or not.

"(d) The laying of carpet done under a building lease-maintenance contract and paid for out of public funds.

"(e) The laying of carpet in a public building done under contract and paid for in whole or in part out of public funds."

Labor Code, section 1771: "Not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter, shall be paid to all workmen employed on public works exclusive of maintenance work."

Labor Code, section 1775: "The contractor shall, as a penalty to the State or political subdivision on whose behalf the contract is made or awarded, forfeit twenty-five dollars ($25) for each calendar day, or portion thereof, for each workman paid less than the stipulated prevailing rates for such work or craft in which such workman is employed for any public work done under the contract by him or by any subcontractor under him. The difference between such stipulated prevailing wage rates and the amount paid to each workman for each calendar day or portion thereof for which each workman was paid less than the stipulated prevailing wage rate shall be paid to each workman by the contractor, and the body awarding the contract shall cause to be inserted in the contract a stipulation that the provisions of this section will be complied with.

"To the extent that there is insufficient money due a contractor to cover all penalties forfeited and amounts due in accordance with this section, or in accordance with Section 1813 of this chapter, and in all cases where the contract does not provide for a money payment by the awarding body to the contractor, the awarding body shall notify, provided that in the case of a workman claiming the difference between the prevailing wage rate and the amount paid him the awarding body has first been given the notice mentioned in Section 1190.1 of the Code of Civil Procedure, the Division of Labor Law Enforcement of such

violation and the Division of Labor Law Enforcement, if necessary with the assistance of the awarding body, may maintain an action in any court of competent jurisdiction to recover the penalties and the amounts due provided for herein. Such action shall be commenced not later than 90 days after the filing of a valid notice of completion in the office of the county recorder in each county in which the public work or some part thereof was performed, or not later than 90 days after acceptance of such public work, whichever last occurs. No issue other than that of the liability of the contractor for the penalties allegedly forfeited and amounts due shall be determined in such action, and the burden shall be upon the contractor to establish that the penalties and amounts demanded in such action are not due."

(a) The parties have cited to us cases which, they contend, provide us with a definition of the term "public work" applicable to the case at bench. None of the cases cited are helpful in our task, since they involve quite different operations.[3] ■ We conclude that the 1963 contract before us is not one for a "public work" within the meaning of section 1720 of the Labor Code. Although unique in its provisions, it is, in essence, an oil and gas lease, calling for payment of royalties to the city. Development is obligated to drill for, produce and sell oil and gas from the tidelands involved. It operates at its own risk, since the city is not obligated to reimburse Development for any losses incurred in the operations. The city's only interest is in receiving its percentage of the oil and gas produced and sold. The fact that royalties are to be computed in a manner different from the ordinary oil and gas lease does not make the contract anything other than a lease. While the contract requires Development to construct drilling and collateral equipment, that equipment is not the property of the city, but remains the property of Development, removable at the termination of its lease. The contract does not contemplate any of the results falling within the kinds of results contemplated by section 1720.

### III

Since we conclude that the 1963 contract was not for a "public work," we need not, and do not, determine whether the compensation to Development is from "public funds" within the meaning of section 1720.

---

[3] Plaintiff has cited *Priest* v. *Housing Authority* (1969) 275 Cal.App.2d 751 [80 Cal.Rptr. 145], which involved the interpretation of the word "demolition." Defendants have cited *Cutting* v. *McKinley* (1933) 130 Cal.App. 136 [19 P.2d 507], which involved an employee engaged in the construction of the Hetch Hetchy Dam.

## IV

■ Not only is the contract not one for a "public work," but plaintiff has no standing to enforce section 1771 even if it did involve such a "public work."

Under section 1775, the benefits of section 1771 accrue only to the workmen paid the less than prevailing wage. The penalty of $25 per workman per day is payable only to the workmen so underpaid. No right of recovery is given to any other persons.

We recognize that the statute imposes a duty on the city and on the contractor to enforce the rights of the workmen, but the present suit is not one in which that duty may be enforced. Plaintiff sues only on behalf of its members—persons who, under the allegation of the complaint, are not persons employed at the less than prevailing wage. Whether a taxpayer might have standing, in a taxpayer's suit, to compel enforcement action under section 1775 we need not decide, since plaintiff is not, and does not allege itself to be, a taxpayer of the City of Long Beach.

The judgment (order of dismissal) is affirmed.

Dunn, J., and Jefferson (Bernard), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 26, 1977.

## APPENDIX

"Section 2. EMPLOYMENT.

"2.1. The City hereby employs the Contractor (as the successful bidder), and the Contractor hereby accepts said employment, for and during the term hereof and at the sole cost and expense of the Contractor, to take and account for all of the oil referred to in Section 18 hereof, to conduct drilling repressuring and oil recovery operations on the Subject Lands, including the construction, erection, operation, maintenance, repair, and abandonment of Oil Wells, Water Source Wells, Injection Wells, injection plants, pipelines, tank farms, artificial lifting equipment, electrical systems, structures and other

facilities required for the performance of the Contractor's obligations under this agreement. The Contractor shall furnish, supply, and pay for all services, work and labor and expert and scientific service and advice required for the operations embraced in this agreement. The Contractor shall perform all of its obligations hereunder according to the standards hereinafter specified. The Contractor shall use and operate all existing Oil Wells, Water Source Wells, Injection Wells, injection plants, pipelines, tank farms, artificial lifting.equipment, electrical systems, structures and other facilities in connection with its operations hereunder.

"Section 3. RELATIONSHIP OF THE PARTIES.

In performing the obligations hereunder, the Contractor is engaged solely in the capacity of independent contractor, it being expressly understood that no relationship between the contracting parties hereto other than that of independent contractor has been, or is intended to be, created by this agreement. This agreement does not constitute, and the parties hereto do not intend it to create, a partnership between said parties, or a joint venture, or the relationship of master and servant, or principal and agent. Said parties hereto have entered into this agreement with full knowledge of the provisions of California Statutes of 1911, page 1304 (Chapter 676), California Statutes of 1925, page 235 (Chapter 102), California Statutes of 1935, page 793 (Chapter 158) and Chapter 29, Statutes of California, First Extraordinary Session 1956. It is not the intention of the City to nor does the City grant, convey, give or alien to or vest in the Contractor, for any purpose whatsoever, any title, interest or estate in or to any lands whatsoever, or any title, interest or estate in or to the oil, gas, and/or other hydrocarbons and/or other minerals underlying any lands whatsoever, or any title, interest or estate in or to said oil when removed from any lands until sold; nor shall the Contractor ever have any interest in or be entitled to any compensation based upon any gas produced from or allocated to the Subject Lands. It is not the intention of the Contractor that this agreement shall at any time nor shall the same be so construed as to grant, convey, give or alien to or vest in the Contractor, for any purpose whatsoever, any title, interest or estate in or to any lands whatsoever hereunder, or any title, interest or estate in or to the oil, gas, and/or other hydrocarbons and/or other minerals underlying any lands whatsoever hereunder, or any part thereof, or any title, interest or estate in or to said oil when removed from any lands until sold; nor shall the Contractor ever have any interest in or be entitled to any compensation based upon any gas produced from or allocated to the Subject Lands. It is the intention of each and all of the parties hereto that insofar as the Subject Lands, or the oil, gas, and/or other hydrocarbons and/or other minerals underlying the Subject Lands, or when removed therefrom, may be affected, if at all, by California Statutes of 1911, page 1304 (Chapter 676), California Statutes of 1925, page 235 (Chapter 102), California Statutes of 1935, page 793 (Chapter 158), and Chapter 29, Statutes of California, First Extraordinary Session 1956, or by any trust for commerce, navigation or fishery, such parts of said lands so affected shall be at all times so used, and said oil, gas, and/or other hydrocarbons and/or other minerals underlying the same shall be so removed and disposed of as not to violate said statutes hereinabove enumerated, or any of them, or any part or portion of either of them, or any such trust for commerce, navigation or fishery; and should a court of competent jurisdiction hereafter hold, by final judgment, that this agreement does grant, convey, give or alien to or vest in the Contractor, for any purpose whatsoever, any right, title, interest or estate in or to the Subject Lands, or any right, title, interest or estate in or to any oil underlying the Subject Lands, or any right, title, interest or estate in or to said oil when removed from the Subject Lands but prior to the sale thereof, in any manner or to any extent which is by such judgment held to be contrary to and/or in violation of said statutes, or either of them, or any provision or provisions of said statutes, or either of them, or of any such trust for commerce, navigation, or fishery, then, and in that event, this agreement, to the extent, and only to the extent, that it is so held to violate the aforesaid statutes, or any of them, or any provision or provisions of said statutes, or any of them, shall, as of the date hereof, be and become, without further act upon the part of either of the parties hereto, null and

void and of no force whatsoever.

"Section 18. OIL PURCHASES.

"18.1. During the entire term of this agreement, the Contractor shall have the exclusive right (except as provided in subsection 18.2 hereof) and it shall be the Contractor's obligation to take, account for and pay to the City in cash in the manner set forth in Section 21 hereof for:

"21.3. The Contractor shall retain:

"(a) The sums of money, sometimes hereinafter referred to as the 'Reimbursable Expenses,' which are necessary, subject to the limitations in this agreement set forth, to reimburse the Contractor for the full amount of any reasonable and necessary costs actually incurred or expended by the Contractor in the performance of its obligations hereunder, in strict accordance with the terms, covenants and conditions hereof, and whether or not it is herein specified that such obligation shall be at the sole cost and expense of the Contractor; and

"(b) That portion of the Net Profits equal to the difference between one hundred percent (100%) of the Net Profits and the City's 91% share of Net Profits."