[No. A057602. First Dist., Div. Two. Apr. 16, 1993.]

SCOTT R. McINTOSH et al., Plaintiffs and Appellants, v.
LLOYD W. AUBRY, JR., as Director, etc., et al., Defendants and
Respondents;
PRICOR, INC., et al., Real Parties in Interest and Respondents.

1578

**COUNSEL**

Philip Paul Bowe for Plaintiffs and Appellants.

William C. Katzenstein, County Counsel, Robert Pepper, Deputy County Counsel, John Rea, Vanessa Holton and Gary J. O'Mara for Defendants and Respondents.

Thomas, Luebs & Mort and Kenneth S. Bayer for Real Parties in Interest and Respondents.

**OPINION**

**SMITH, J.**—Class action plaintiffs engaged in the construction of a residential care facility (the Helicon Project) in Riverside County (the County)

petitioned the superior court for writ of mandate against a decision by the Director of the Department of Industrial Relations (the Director) that the project was not a "public works" project under Labor Code section 1720 or 1720.2 of the prevailing wage law.[1] The court denied relief, finding no abuse of discretion and giving judgment for the Director, his agency (the DIR) and real parties in interest, the latter being the County and various corporate entities involved in the project. Plaintiffs appeal the judgment. We affirm.

### BACKGROUND

The Helicon Project grew out of County efforts to find a qualified, privately run residential shelter care facility to shelter and treat disturbed or abused minors under its charge. Lacking a facility of its own, the County had previously placed such minors in residential foster homes.

The County in 1988 put out a request for proposals (RFP) describing its facility/program requirements and offering four alternatives. One was for bidders to build facilities, at no cost to the County, on land leased from the County. Another was to do so on privately acquired land. A third was to use existing structures, and a fourth was to use some combination of the others. The RFP expressed the County's intent to place minors into the facility to the fullest extent possible, contingent on the bidder maintaining adequate programs.

Successful bidder Helicon, Inc. (Helicon), a nonprofit corporation, entered a sublease with the County on September 12, 1989, which is a negotiated version of the first RFP alternative. The County, which held a ground lease on a large tract of undeveloped land, agreed to sublease 5.65 acres of it to Helicon.[2] The term was for 30 years, with 2 five-year extension options, and Helicon would use the land for "constructing, operating and maintaining a residential shelter care facility for residents of County who are emotionally disturbed minors . . . ." That use would be consideration for the first 20 years, during which time no rent would be paid. After 20 years, Helicon would pay rent at fair market value.

---

[1] All unlabeled section references in this opinion are to the Labor Code.

[2] Paragraph 1 recitals state: "(a) County does not have a residential shelter care facility for emotionally disturbed minors and as a result must place such minors in residential foster homes. [¶] (b) County supports the development of a residential shelter care facility for emotionally disturbed minors, and Sublessee represents that it has the background, experience, and final capability of constructing, operating, and maintaining such a facility. [¶] (c) Pursuant to Section 26227 of the Government Code, the Board of Supervisors of County deems that the development of a residential shelter care facility as described in Paragraph 1(b) above is necessary to meet the social needs of certain residents of County as it relates to health and welfare, and is willing to make certain real property available to Sublessee to carry out such development."

Helicon agreed to build at its expense a facility of at least 116 beds plus improvements, including an access road and off-site utilities to serve the project. On-site fixtures and improvements would remain Helicon's property unless Helicon failed to remove them and restore the premises at the end of the sublease, in which case they would become the County's.[3]

The sublease initially obligated Helicon to "obtain performance, material and labor, and payment bonds" but was amended in December 1989. Under the amendment, the County would provide up to $75,000 in bond premiums and Helicon would reimburse the County in the event that on-site improvement costs exceeded $5 million. The County in March 1990 paid $70,500 to Insurance Company of the West (ICW) as bond premiums, after the bond language was amended a second time.[4]

Sublease language in the on-site improvements part called attention to and incorporated by reference provisions of the Labor Code, including prevailing-wage sections. It recited that the parties' execution of the sublease constituted "their agreement to abide by" those provisions. Further language in the same paragraph recited that Helicon and its subcontractors "shall comply with" a Labor Code section "regarding apprentices" (§ 1777.5) and that Helicon "shall post" prevailing wage rates during the course of construction.

Actual construction was performed under an agreement between Helicon and general contractor Amemar, Inc. (Amemar), a California corporation doing business as Pricor, Inc. (Pricor). Consistent with sublease negotiations, the County absorbed some construction inspection costs on the project rather than charge Helicon for them. Allegedly, prevailing-wage notices were not posted and prevailing wages were not paid.

---

[3]Paragraph 6(e) states: "All such improvements, alterations and fixtures (including, but not limited to, trade fixtures as that term is used in Section 1019 of the Civil Code) shall remain the property of Sublessee; provided, however, that Sublessee removes, at its expense, such improvements, alterations and fixtures at or prior to the expiration of this sublease and restores the subleased premises to their original shape and condition as nearly as practicable. In the event Sublessee does not so remove such improvements, alterations and fixtures, they shall become the property of County for no further consideration of any kind (except as provided in Paragraph 18 herein [reimbursement upon sublessee's termination for County's failure to perform], if applicable), and Sublessee shall execute any documents that may be required or necessitated conveying its interest in such improvements, alterations and fixtures to County."

[4]The second amendment changed "the last sentence" of paragraph 6(a) to require performance and payment bonds only, required that they be "substantially in the form" set out in attached drafts issued by ICW, limited coverage to on-site improvements, and gave a County administrative officer discretion to reduce "the penal sum" of such bonds at Helicon's request.

A midproject complaint to the Division of Labor Standards Enforcement (DLSE) made by the Center for Control Compliance in July 1990 resulted in a referral to the Director for a coverage determination of whether the project was a public work under section 1720 or 1720.2 and therefore subject to the prevailing wage law. The Director decided against coverage in December 1990, and several plaintiffs herein appealed that determination administratively.

Pending the administrative appeal, plaintiffs in April 1991 filed suit against Pricor, Helicon and ICW in the Riverside County Superior Court, seeking, inter alia, damages for breach of contract (based on the sublease references to the prevailing wage law) and asserted statutory obligations.

The Director issued his written appeal decision in August 1991 based on a record created from stipulated documents. He adhered to the no-coverage decision, rejecting arguments, among others, that the County's forbearance of rent, payment of surety bond premiums and absorption of inspection expenses were expenditures of "public funds" within the meaning of section 1720, subdivision (a). He also ruled that neither that section nor section 1720.2 was implicated by the County's right to take possession of unremoved improvements at the end of the sublease or by its commitment to pay for services at the facilities.[5] He noted the pending contract action but, lacking jurisdiction over the matter, expressed no view.

On August 12, plaintiffs challenged the Director's appeal decision by filing this action for writ of mandate in San Francisco Superior Court against respondent Director and the DIR. Real parties in interest are Pricor, Helicon, Amemar, ICW and the County. On the same day, the superior court in the contract action gave judgment for the defendants, sustaining a demurrer without leave to amend. Plaintiffs appealed to the Court of Appeal, Fourth Appellate District.

The mandate action proceeded in San Francisco Superior Court and was heard in February 1992. Newly disclosed facts included an admission that as of October 1991, the County had incurred $14,655 in inspection costs and $27,368.57 in project management costs on the Helicon Project. Also, a third amendment to the sublease, executed in February 1992, had extended the completion date to the end of March 1992 and provided for reimbursement

---

[5]Paragraph 5(a) of the sublease ("*Consideration/Rent*") incorporates by reference a memorandum of understanding between Pricor (as service provider) and the County detailing anticipated treatment programs. It states in part: "The County commits to placing children in need of treatment into facilities that are developed as a result of this Memorandum. Payments for the majority of the programs will be made through normal AFDC-FC as approved by the State Department of Social Services."

of the $70,500 bond payment made by the County. The amendment noted that improvement costs had exceeded $5 million and that, by virtue of the first (Dec. 1989) amendment, repayment of bond premiums would be made in 14 monthly installments "commencing upon placement initially of 40 minors" in the facility. Also available at the time of the hearing was the recent decision in *Lusardi Construction Co.* v. *Aubry* (1992) 1 Cal.4th 976 [4 Cal.Rptr.2d 837, 824 P.2d 643] (*Lusardi*), which provided guidance on public works under the prevailing wage law.

The court denied mandate, finding no abuse of discretion in the coverage decision and of course taking no position on the issues in the pending contract action.[6] There was no statement of decision.

## DISCUSSION

### I

Plaintiffs petitioned for traditional mandate (Code Civ. Proc., § 1085) and, alternatively, administrative mandate (*id.*, § 1094.5). The court ruled that the former applied and that the precise issue, whether stipulated facts showed a public work, posed a question of law. ■ Respondents and real parties in interest (collectively respondents)[7] ask us to employ abuse-of-discretion review using the "substantial evidence" test applied in administrative mandate cases where a court has exercised its independent judgment on evidence produced at an administrative hearing. (*Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308-309 [196 P.2d 20].) Plaintiffs counter that the question is purely legal and that we must therefore not defer to the ruling.

Plaintiffs have the better argument. The Director ignores his own regulations, which deem his coverage determinations (whether a contract is a public work) quasi-legislative and reviewable by traditional mandate (Cal. Code Regs., tit. 8, § 16002.5, subd. (a)). This accords with *Lusardi*'s holding that the determination "cannot be accurately characterized as 'judicial,' because it does not encompass the conduct of a hearing or a binding order for any type of relief" (*Lusardi, supra*, 1 Cal.4th 976, 993 [rejecting arguments that due process notice rights apply at the agency stage]). It also

---

[6]We take judicial notice that Division Two of the Fourth Appellate District has since filed an unpublished opinion in the contract action (*McIntosh* v. *Pricor, Inc.* (Dec. 22, 1992) E010001). For reasons not important here, the court reversed the judgment and directed the trial court to abate the action pending final resolution of the instant action.

[7]The Director and DIR have filed a brief, as have private real parties in interest. The County, which remained neutral below and was not a party to the related contract action, has elected not to file a brief.

accords with prior authority holding that public-works coverage determinations, because they entail interpretations of section 1720, cannot be shielded from mandate review by labeling them discretionary: "Interpretation or construction of a statute is a matter of law; not the exercise of discretionary authority." (*Priest* v. *Housing Authority* (1969) 275 Cal.App.2d 751, 754 [80 Cal.Rptr. 145]; *Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 982-983 [137 Cal.Rptr. 699].)

In any event, distinctions between traditional and administrative mandate have little impact on this appeal because, as the trial court correctly observed, the material facts were stipulated, raising a purely legal question of the prevailing wage law's application to them. We exercise independent judgment in that situation, no matter whether the issue arises by traditional or administrative mandate. (*City of Fremont* v. *Board of Administration* (1989) 214 Cal.App.3d 1026, 1030 [263 Cal.Rptr. 164]; *City of Coachella* v. *Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1289 [258 Cal.Rptr. 795].) The parties draw differing conclusions from the documents regarding the intent behind using the prevailing wage references in the sublease, but that dispute bears on the contract action, not this action.

## II

■■■ The issue here is whether the sublease called for "public works" within the meaning of section 1720 or 1720.2.[8] We agree with the Director and court below that it did not.

---

[8] Section 1720. "As used in this chapter, 'public works' means:

"(a) Construction, alteration, demolition, or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority.

"(b) Work done for irrigation, utility, reclamation, and improvement districts, and other districts of this type. 'Public work' shall not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages.

"(c) Street, sewer, or other improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether the political subdivision or district operates under a freeholder's charter or not.

"(d) The laying of carpet done under a building lease-maintenance contract and paid for out of public funds.

"(e) The laying of carpet in a public building done under contract and paid for in whole or part out of public funds.

"(f) Public transportation demonstration projects authorized pursuant to Section 143 of the Streets and Highways Code."

Section 1720.2. "For the limited purposes of Article 2 (commencing with Section 1770) of this chapter, 'public works' also means any construction work done under private contract when all of the following conditions exist:

"(a) The construction contract is between private persons.

*Section 1720.2*

"Public works" under section 1720.2 means construction work done where (1) the contract is between private persons, (2) the property is privately owned but will have at least 50 percent of its space leased by a public agency after completion and (3) the lease agreement was entered either (a) prior to the construction contract or (b) by completion of the construction if the construction was carried out according to the agency's plans, specifications or criteria. (See fn. 8, *ante.*)

One obstacle is that the asserted construction contract here is *not* "between private persons" (§ 1720.2, subd. (a)); it is between a private entity and a county. The record refers to an "oral contractual arrangement" between Helicon and Pricor (two private entities) for the actual construction, but the precise terms of that "contract" are not before us.

Another obstacle is that there is no lease of space (50 percent or otherwise) by the County (§ 1720.2, subds. (b) & (c)). The only lease agreement is the sublease for the acreage on which the project sits, and section 1720.2 covers a lease of completed facilities, not the underlying land. Moreover, the lessee is Helicon, not the County. The County has committed itself to place minors in the finished facilities but has not agreed in any way to lease the facilities.

Section 1720.2 does not apply.

*Section 1720*

"Public works" under section 1720, subdivision (a), means "[c]onstruction . . . done under contract and paid for in whole or in part out of public funds," and the debate here is whether the sublease called for the payment of "public funds" to construct the Helicon Project. We find no such payment in any of the asserted particulars discussed below.

---

"(b) The property subject to the construction contract is privately owned, but upon completion of the construction work, more than 50 percent of the assignable square feet of the property is leased to the state or a political subdivision for its use.

"(c) Either of the following conditions exist:

"(1) The lease agreement between the lessor and the state or political subdivision, as lessee, was entered into prior to the construction contract.

"(2) The construction work is performed according to plans, specifications, or criteria furnished by the state or political subdivision, and the lease agreement between the lessor and the state or political subdivision, as lessee, is entered into during, or upon completion of, the construction work."

### 1. *Payment for services*

By a memorandum of understanding incorporated in the sublease, the County "commits" to placing minors in the finished facility and using what are undisputedly public funds to pay for their care and treatment there (fn. 5, *ante*). However, that is payment for later services, not preliminary construction. ▮▮▮ We hold that paying public funds for public services does not make incidental construction work done by a private provider of those services "public works" under section 1720, subdivision (a). **(2b)** The statute requires payment for "construction"; to take that as meaning "services" would violate plain, unambiguous language, which we cannot do. (*Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 73 [276 Cal.Rptr. 130, 801 P.2d 373].)

It would also clash with case law precedent. In *International Brotherhood of Electrical Workers* v. *Board of Harbor Commissioners* (1977) 68 Cal.App.3d 556 [137 Cal.Rptr. 372] (*International Brotherhood*), a lease providing for a private developer to construct oil and gas facilities on city tidelands, operate them and pay royalties to the city-lessor as consideration was not a public works contract, where the facilities remained the property of the developer for the lease term, removable by the lessee upon termination. (*Id.*, at p. 562.) If that contract for services (development of city resources) fell outside the public-works definition despite private construction needed to provide the services, then so must the contract here. Helicon constructs needed facilities at its expense, assumes all risk of loss in their later operation and retains ownership throughout the lease term, with a right to remove them later (fn. 3, *ante*). The fact that Helicon has no right to remove *off*-site road and utility improvements made to serve the project is not a persuasive distinction. Off-site improvements are common to such projects and, of course, are by definition not part of the leased premises on which the service is rendered; they cannot reasonably be deemed part of the contracted-for service.

Finally, holding that private construction needed to provide services to a county is enough to create a public work would call into question many services contracts entered, as here (see fn. 2, *ante*), under the authority of Government Code section 26227.[9] That section promotes county alliances with the private sector to secure public services. The Constitution bars *gifts*

---

[9]Government Code section 26227 states in pertinent part: "The board of supervisors of any county may appropriate and expend money from the general fund of the county to establish county programs or to fund other programs deemed by the board of supervisors to be necessary to meet the social needs of the population of the county, including but not limited

of "any public money or thing of value" to a private person or entity (Cal. Const, art. XVI, § 6, 1st par.) and thus demands that payments to a private party serve a public, rather than private, purpose in consideration. (*County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 745-746 [former art. XIII, § 25]; *City of Oakland* v. *Garrison* (1924) 194 Cal. 298, 301-302 [228 P. 433] [former art. IV, § 31].) Government Code section 26227 allows a county, on finding a need for programs serving a public purpose, to contract with a nonprofit private entity for those services. In furtherance of that arrangement, it allows a county to make surplus land available for lease or sale *and* to "finance or assist in the financing" of the nonprofit group's acquisition or improvement of it "through a lease, installment sale, or other transaction," all without the county meeting burdensome transfer requirements (fn. 9, *ante*).

Government Code section 26227 does not mention public works status for such projects, but it is arguably inconsistent to have counties entice private development with lease or sale incentives on the one hand, and then subject such development to the financial disincentive of public works status (*Lusardi, supra*, 1 Cal.4th 976, 987) on the other. Plaintiffs make contrary policy arguments, but those are better addressed to the Legislature (*Shalz* v. *Union School Dist.* (1943) 58 Cal.App.2d 599, 607 [137 P.2d 762]), which can carefully craft conditions as it has, for example, in section 1720.2 or in other subdivisions of section 1720 (fn. 8, *ante*). We read the prevailing wage statute in its present form to exclude from "public works" private construction needed to provide the services for which the public entity has contracted.

## 2. *Rent forbearance*

Plaintiffs contend that the County's agreement to forego rent for the first 20 years of the sublease amounts to the payment of public funds for

to, the areas of, health, . . . welfare, . . . and the needs of physically, mentally and financially handicapped persons . . . .

"The board of supervisors may contract with . . . private agencies or individuals to operate those programs which the board of supervisors determines will serve public purposes. In the furtherance of those programs, the board of supervisors may make available to a . . . nonprofit corporation, or nonprofit association any real property of the county which is not and, during the time of possession, will not be needed for county purposes, to be used to carry out the programs, upon terms and conditions determined by the board of supervisors to be in the best interests of the county and the general public, and the board of supervisors may finance or assist in the financing of the acquisition or improvement of real property . . . to be owned or operated by any . . . nonprofit corporation, or nonprofit association to carry out the programs, through a lease, installment sale, or other transaction, in either case without complying with any other provisions of this code relating to acquiring, improving, leasing, or granting the use of or otherwise disposing of county property.

". . . . . . . . . . . . . . . . . . . . . . . ."

construction. There does not appear to be any precedent, and the Director's appeal decision found this issue "the most difficult" one for that reason. The parties cite cases on the ban against gifts of public funds (see, e.g., *Community Television of So. Cal.* v. *County of Los Angeles* (1975) 44 Cal.App.3d 990, 996-997 [119 Cal.Rptr. 276]), but they provide a poor analogy. Most importantly, the operative language there is "public money *or thing of value*" (Cal. Const., art. XVI, § 6, italics added), whereas our statute speaks more narrowly of "public funds" (§ 1720, subd. (a)).

■ "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.]" (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) ■ The full phrase here is "paid for in whole or in part out of public funds" (§ 1720, subd. (a)). Does it encompass the forbearance of rent? ■ The verb "pay," standing alone, can in its usual and ordinary sense include the transfer of things other than money. It means "to satisfy (someone) for services rendered or property delivered" or to "discharge an obligation"; "PAY is a general term, usu[ally] lacking particular connotation but sometimes bluntly stressing the purchase of services . . . ." (Webster's Third New Internat. Dict. (1965) p. 1659.) Even "[i]n a more restricted legal sense[,] payment is the performance of a duty promise, or obligation . . . by the delivery of money or other value"—"the delivery of money or its equivalent . . . ." (Black's Law Dict. (6th ed. 1990) p. 1129.)

■ However, the "payment" here must be "out of public funds" (§ 1720, subd. (a)). The word "funds" is not specially defined in the statute but "has a well-established meaning in common parlance . . . . The dictionary defines it as 'available pecuniary resources ordinarily including cash and negotiable paper' [citation], and in a legal context the courts have also taken it to include property of value which may be converted into cash [citations]." (*Keene* v. *Keene* (1962) 57 Cal.2d 657, 663 [21 Cal.Rptr. 593, 371 P.2d 329].) The county's right to charge rent is not an available pecuniary resource like cash or some readily cash-convertible asset. To take rent *collected* from one source and use it to pay obligations would plainly be a payment of public funds, but the County here will not collect the rent. Nor, according to our record, will it lose appreciable rents it otherwise might have charged for the acreage in its unimproved state. Also, it may be more accurate to view uncharged rent over 20 years as an ongoing subsidy of contracted-for *services* rather than initial *construction*. The contract originally envisioned only a year of construction, during which time, of course, the commercial value of the land would be at its lowest.

The forbearance of rent here, while valuable as a negotiating tool in securing the total project, does not fit comfortably into the idea of "construction" "paid for . . . out of public funds." Plaintiffs attribute the ill fit to

changing times: words which were easy to apply when counties contracted for projects directly have become awkward in a post-Proposition 13 age when cash-poor counties turn increasingly to alliances with private industry. In plaintiffs' view, we must expand the meaning of anachronistic language to fit the realities of the present, or risk frustrating legislative intent.

We view the situation differently. ■ Courts will liberally construe prevailing wage statutes (*Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 634-635 [12 Cal.Rptr. 671, 361 P.2d 247]; *Cassaretto* v. *San Francisco* (1936) 18 Cal.App.2d 8, 10 [62 P.2d 777]), but they cannot interfere where the Legislature has demonstrated the ability to make its intent clear and chosen not to act (*Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 50 [276 Cal.Rptr. 114, 801 P.2d 357]). ■ We do not share plaintiffs' view that the Legislature has overlooked changes in county needs or practices in this area. It has in fact been active. It last amended Government Code section 26227 in 1991 (fn. 9, *ante*) and has regularly amended the prevailing wage law to keep pace with evolving realities. Section 1720.2 was such a reaction, as was the 1989 addition of section 1720.4 and subdivision (f) of section 1720 (see fn. 8, *ante*). Those balanced solutions show current awareness by the Legislature. We adhere to the plain meaning of section 1720, subdivision (a), and decline to read it more expansively.

### 3. *Inspection costs*

The same reasons compel us to reject plaintiffs' view that the County's absorption of certain inspection costs was a payment for construction with public funds. County supervisors decided early on that their building services department would "provide compliance and quality construction inspection services to assure that the facility is built in accordance with plans, specifications and Building Codes"; costs up to $9,000 would be "charged" to the department of public social services. The later-signed sublease does not mention the costs, but the County admitted in superior court that it had absorbed about $42,000 in inspection and "project management" costs by mid-October 1991. The parties debate which amount is pertinent (i.e., what the Director knew or what the court knew), but we do not regard the amount as important. The *nature* of the costs is important, and is undisputed. The County waived costs it normally charges for routine inspections and allocated them between departments for internal accounting purposes. The $42,000 apparently includes partial salaries for the County employees involved, but there is no suggestion that extra people were hired to absorb the work. "Project management" evidently did not involve construction supervision, as the term might imply.

We hold that the cost waivers were not public funds paid for construction (§ 1720, subd. (a)). Like the forbearance of rent, these "costs" involve no payment of funds out of county coffers. Legislators could easily express an intent to bring waived costs (or rent) within the concept of payment with "public funds" but have not done so. A holding that waived inspection costs are partial payments from public funds could make public works of any project where a county has used cost waivers as incentives to development, even though the project may serve purely private needs. The statute gives no warning that this result was intended.

### 4. Bond premiums

The County spent $70,500 to pay performance and payment bond premiums on the project. There is no dispute that this was a use of "public funds." However, both the Director and apparently the court below concluded that the money was in essence a loan, not a payment, because Helicon agreed to reimburse the County once on-site improvements exceeded $5 million.

We conclude that Helicon did obligate itself at all pertinent times to reimburse the County for premiums paid should the $5 million mark be reached. Plaintiffs' contrary view is built on an unreasonable reading of the sublease amendments.[10] We also conclude that a loan of public funds to finance bond premiums during private construction is not construction "paid for" with public funds under section 1720, subdivision (a). The public agency is not ultimately paying for the bond; the builder is. This is logical and accords with the Director's prior rulings. We do not find significant the fact that the loan here may have been interest free. Interest not charged is like rent or fees not charged, and we have no evidence showing, in any event, that the County lost interest it otherwise would have earned with those funds.

---

[10]Paragraph 6(a) originally called for "performance, material and labor, and payment bonds" and obligated Helicon to obtain them on its own. The first amendment added two sentences, the first obligating the County to pay up to $75,000 in premiums and the second conditionally obligating Helicon to reimburse the County. The second amendment, executed shortly before the County paid premiums, amended and replaced "the last sentence" of paragraph 6(a). It incorporated ICW bond forms by reference and limited the needed surety to performance and payment bonds.

Plaintiffs contend that "the last sentence" replaced by the second amendment was the last (second) sentence *of the first amendment,* thereby removing Helicon's duty to reimburse. Obviously, that was not intended. Unless "the last sentence" is read as referring to the *original* (and still intact) last sentence of the paragraph, the amendment makes no sense. It would leave two conflicting descriptions of the kinds of bonds required. The second amendment was clearly meant to supplant the original reference to "material and labor" bonds, not to eliminate the reimbursement duty.

The main dispute is whether the improvements would or did exceed $5 million. The sublease used language of condition, providing for reimbursement "[i]n the event" the improvements exceeded $5 million. A May 1991 letter states that Helicon at first obtained and paid for a letter of credit in the amount of $5 million but that, when the County insisted on bonds, the matter was resolved by Helicon posting its letter of credit and the County paying the bond premiums. This does not illuminate whether improvements were expected to exceed $5 million, nor does the figure itself, which may have had to do with statutory thresholds rather than cost projections.[11]

On that record, the Director concluded that "[t]he County, in essence, lent money to the lessee/contractor in the form of payment for performance bonds until a finished product was left on the land, and it was, thereafter, reimbursed for the sum loaned. . . ." Plaintiffs correctly note that there was no showing then that reimbursement had been made or that the $5 million cost threshold had been reached.

The first evidence was the third sublease amendment, which was executed *after* the Director's appeal decision and introduced only in the superior court. The amendment reflects that costs had exceeded $5 million and that Helicon would start reimbursing the County in monthly installments of $5,000 once the first 40 minors were placed in the facility.[12] The court apparently relied on the amendment. ■ Plaintiffs claim error, urging that anything not before the Director was irrelevant and that the amendment was a self-serving "ploy" casting "no meaningful light" on the parties' intent months earlier.

---

[11]The actual bonds are not in the record, but the ICW drafts attached to the first amendment cite public-works bond provisions (Civ. Code, §§ 3181, 3247-3252), the County perhaps thinking that they would or might apply. The threshold figure of $5 million for reimbursement appears correlated to Civil Code section 3248, which calls for payment bonds in a sum equal to one-half the total amounts payable on projects of $5 million or less (subd. (a)(1)) but only one-fourth value for projects between $5 million and $10 million (subd. (a)(2)). This implies that reimbursement would start if the project reached the less costly bond threshold of $5 million but does not explain how likely that contingency was.

[12]We reject any concern about the third amendment not being fully executed. The court had a copy executed only by Helicon but also had a Helicon officer's declaration claiming personal knowledge that the amendment had been executed by both parties. The court was entitled to rely on the declaration.

The amendment states in part: "Sublease [*sic*] represents that the cost of the improvements referred to in Paragraph 6(a) of the Sublease exceeded the sum of $5,000,000, and that by virtue of the provisions contained in the First Amendment to Sublease, Sublessee is obligated to reimburse County the sum of $70,500 which represents the premium paid by County to the surety, Insurance Company of the West. Sublessee agrees to make such reimbursement in fourteen (14) monthly installments . . . and such installments shall be payable on the first day of the month commencing upon placement initially of 40 minors within the residential shelter care facility. Sublessee further agrees to notify County's Director of General Services Agency and Director of Department of Social Services forthwith, in writing, when such placement occurs."

No error occurred. "In an action for administrative mandamus, the court reviews the administrative record, receiving additional evidence only if that evidence was unavailable at the time of the administrative hearing, or improperly excluded from the record. [Citation.] In a traditional mandamus action, on the other hand, the court is not limited to review of the administrative record, but may receive additional evidence. [Citations.]" (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 79, fn. 6 [118 Cal.Rptr. 34, 529 P.2d 66].) "[A] judge hearing a mandamus proceeding may properly consider . . . all relevant evidence, including facts not existing until after the petition for writ of mandate was filed. This is so because mandamus is an action where equitable principles apply [citations], and because issuance of the writ is frequently a matter for the court's discretion [citations]." (*Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 670-671 [56 Cal.Rptr. 265, 423 P.2d 193].)

■ The court below observed that this case posed a legal question of the application of stipulated facts to the law, but the court was also clearly aware that one factual question was unresolved—whether the contingency triggering Helicon's duty to reimburse had occurred. The third amendment proved that occurrence: the project's on-site improvements had exceed $5 million, making Helicon obligated to repay the bond premiums. Plaintiffs' concerns about self-serving new evidence (cf. *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 394 [253 Cal.Rptr. 426, 764 P.2d 278] [rejecting postaction environmental review as "*post hoc* rationalizations to support action already taken"]) are misplaced. We have held, contrary to their claim, that Helicon was conditionally bound under the first sublease amendment to reimburse the County at all relevant times (fn. 10, *ante*). That conclusion is established as a matter of law from the stipulated documents, making the third amendment's "intent" value superfluous. The important question was whether the cost-threshold condition had occurred. If it had, there was no need for issuance of the writ, regardless of how the matter may have appeared to the Director earlier. (Cf. *Felt* v. *Waughop* (1924) 193 Cal. 498, 503-505 [225 P. 862] [city clerk not mandated to place name of candidate on ballot where evidence disclosed in the writ action showed the candidate unqualified to hold office].) Plaintiffs opposed admitting the amendment below on the procedural grounds urged here but did not try to show that the costs had in fact *not* reached $5 million. The evidence is uncontradicted.

Plaintiffs suggest that reimbursement was conditional even after the third amendment because there would first have to be 40 minors placed in the facility, but they are mistaken. The duty to reimburse was fixed upon the project reaching the cost threshold of $5 million, and that is what determines the loan/payment distinction. Placement of the 40 minors simply determines

*when* reimbursement will occur (fn. 12, *ante*). Also, placement does not rest entirely within the County's control. The memorandum of understanding grants the County a "right of first refusal to any available bed in the facility" but allows Helicon to accept private placements.

Because the judgment is valid based on bond premiums being a loan rather than a payment for construction, we do not reach respondents' alternative argument that a payment of bond premiums in these circumstances should be viewed, under a risk-of-loss analysis (cf. *International Brotherhood, supra*, 68 Cal.App.3d 556, 562), as a permitted expenditure for insurance against loss by a lessor/county, even if never reimbursed.

### 5. *Cumulative effect*

A theme recurrent in plaintiffs' briefing is that aspects of this case (rent forbearance, inspection costs, bond premiums, public purpose) have a "cumulative" effect warranting public-works status even if the individual aspects do not. We reject that approach as unworkable. Parties must be able to predict the public-works consequences of their actions under reasonably precise criteria and clear precedent. Subdivision (a) of section 1720 would become a quagmire under plaintiffs' approach, the only certain result being constant litigation. The Legislature has formulated precise criteria tailored to many situations in this area (fn. 8, *ante*) and is uniquely suited to balance and address the several policy concerns raised here.

Plaintiffs see in this case an attempt to circumvent the prevailing wage law in contravention of statute and policy, as was found in *Lusardi*. We disagree. A hospital district in *Lusardi* spent $18 million to expand a public hospital. To save money, it tried to avoid public-work status by contracting with a private developer for the construction, having the contract designate itself the developer's agent, contracting as "agent" with a contractor for the construction and representing to the contractor that the project was not a public work. (*Lusardi, supra*, 1 Cal.4th 976, 982-983.) The district argued that the prevailing wage law should apply only if a contract calls for its application; the Supreme Court rejected that interpretation as encouraging awarding bodies and contractors to circumvent the law and its objectives. (*Id.*, at pp. 987-988.)

Here, by contrast, the project was privately financed, the County would not own or run the facilities, and the County acted under the authority of Government Code section 26227 in both contracting for services and offering the sublease and rent forbearance. Far from misrepresenting anything, the County put prevailing-wage provisions in the sublease and took a

tentative position below that there was at least a contractual obligation for Helicon to comply with them.

Plaintiffs find circumvention of a sort in that the sublease provides that the facilities may become the County's if not removed at the end of the sublease term (fn. 3, *ante*). We find no bad faith or circumvention in the provision. Section 1720 does not remotely address that kind of future contingency. Moreover, the County has merely acknowledged its sublessee's right of removal once the sublease terminates (see 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, §§ 618-619, pp. 803-805), and the County, as primary leaseholder, should be expected to contract for control of unremoved improvements in case it is bound under its own lease to restore the premises to their former condition someday (see *id.*, § 620, p. 805). These matters may or may not merit legislative attention, but the law currently does not cover them.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., and Phelan, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 29, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.