173 Cal.App.4th 567 (2009)
___ Cal.Rptr.3d ___
STATE BUILDING AND CONSTRUCTION TRADES COUNCIL OF CALIFORNIA, AFL-CIO, Plaintiff and Appellant,
v.
CITY OF VISTA et al., Defendants and Respondents.
No. D052181.
Court of Appeals of California, Fourth District, Division One.
April 28, 2009.
*572 Altshuler Berzon, Stephen P. Berzon, Scott A. Kronland and Peter E. Leckman for Plaintiff and Appellant.
Edmund G. Brown, Jr., Attorney General, Christopher E. Krueger, Assistant Attorney General, Douglas J. Woods and Peter M. Williams, Deputy Attorneys General, for State Building and Construction Trades Council of California, AFL-CIO, as Amicus Curiae on behalf of Plaintiff and Appellant.
Davis, Cowell & Bowe and John J. Davis, Jr., for Northern California Mechanical Contractors Association, Air Conditioning, Refrigeration and Mechanical Contractors Association of Southern California, California Plumbing and Mechanical Contractors Association, California Sheet Metal Air Conditioning Contractors National Association, Associated Plumbing and Mechanical Contractors Association and Mechanical Contractors Council of Central California as Amici Curiae on behalf of Plaintiff and Appellant.
Weinberg, Roger & Rosenfeld, Sandra Rae Benson, Patricia M. Gates and Roberta D. Perkins for Northern California Basic Crafts Alliance as Amicus Curiae on behalf of Plaintiff and Appellant.
McDougal, Love, Eckis, Smith, Boehmer & Foley, James P. Lough, David M. Stotland; Darold D. Pieper, City Attorney, and Jonathan B. Stone, Deputy City Attorney, for Defendants and Respondents.
Atkinson, Andelson, Loya, Ruud & Romo, Robert Fried and W. Bryce Chastain for Associated Builders & Contractors of California as Amicus Curiae on behalf of Defendants and Respondents.

OPINION
BENKE, Acting P. J.
State Building and Construction Trades Council of California, AFL-CIO (SBCTC), appeals from a trial court judgment denying its petition for a peremptory writ of mandate against the City of Vista (Vista), Vista Mayor Morris B. Vance and Vista City Manager Rita Geldert.[1] SBCTC sought a ruling requiring that Vista comply with California's prevailing wage law (PWL) (Lab. Code,[2] §§ 1720-1780) in the construction of its public works projects notwithstanding its status as a charter city.
*573 We conclude the PWL does not address matters of statewide concern and therefore Vista, as a charter city, is not required to comply with the PWL with respect to public works contracts which are financed solely from city revenues. Rather, such contracts are municipal affairs over which Vista has paramount power under article XI, section 5, subdivision (a) of the California Constitution. Accordingly, we affirm the trial court's judgment denying SBCTC's petition.

FACTUAL AND PROCEDURAL BACKGROUND

A. Adoption of City Charter

In June 2007 Vista became a charter city within the meaning of article XI, section 5 of the California Constitution after its voters approved a ballot measure to adopt a city charter.
At the time of the ballot measure, Vista was anticipating the construction of several capital improvement projects: (1) a new civic center; (2) two fire stations; (3) a new sports park; and (4) a stagehouse for the Moonlight Amphitheater. In advising the city council about the ballot measure, Vista's city attorney explained that the anticipated construction projects were "expected to cost in the neighborhood of $100 million," and "the payment of prevailing wages is likely to add millions of dollars in extra costs to these projects, costs that would not have to be incurred if Vista chooses its own destiny and becomes a charter city." Advocating for a vote in favor of the ballot measure, the Vista city council informed the public that if Vista became a charter city it "could choose when and if it pays `prevailing wages'" on public works contracts. The voters approved the measure and Vista became a charter city.
Shortly thereafter, the Vista city council adopted ordinance No. 2007-9. The ordinance amends Vista municipal code section 3.08.160 to provide:
"A. Payment of prevailing wages. No City contract shall require payment of the prevailing wage schedule unless:
"1. The prevailing wage is legally required, and constitutionally permitted to be imposed, by federal or state grants pursuant to federal or state law; or
"2. The project is considered by the City Council not to be a municipal affair of the City; or
"3. Payment of the prevailing wage schedule is authorized by resolution of the City Council."
*574 Vista has proceeded with its planned public works projects. The record establishes that for the first of those projectsthe two new fire stations Vista has approved a design-build contract that does not comply with the requirements of the PWL.[3]

B. SBCTC's Petition

SBCTC alleges that it is a labor federation composed of local labor unions and local labor councils that collectively represent about 300,000 workers in the building and construction trades in California. In July 2007 SBCTC filed a petition for peremptory writ of mandate against Vista, its mayor and its city manager. Thereafter, SBCTC filed an amended petition (the petition).
The petition alleged Vista is required to comply with the PWL despite its status as a charter city and that "[a]s a result of the adoption of [Vista] Ordinance No. 2007-9, [Vista] will, unless this Court issues its writ of mandate, award contracts for the construction of ... Vista's upcoming capital projects, without requiring the payment of prevailing wages." The petition described the current status of the four capital improvement projects planned by Vistathe civic center, the two fire stations, the sports park, and the Moonlight Amphitheater stagehouse. With respect to the construction of the two new fire stations, the petition alleged Vista already had issued a request for proposals (RFP) to design-build firms, but that "[t]he RFP does not require that the prevailing wages must be paid to the workers who build the fire stations." The other projects were described as similarly proceeding toward implementation, with an RFP being issued for the Moonlight Amphitheater project, and an architect and a landscape architect being selected for the civic center and the sports park, respectively.
The petition prayed that the court issue (1) a peremptory writ of mandate "directing [Vista] to comply with California's prevailing wage law ... whenever they award City construction contracts in excess of $1,000, including by requiring the payment of prevailing wages in the contracts for [the two new fire stations]"; and (2) a declaration that Vista is "obligated to comply with California's prevailing wage law notwithstanding ... Vista's recent adoption of a charter, and that Vista Ordinance No. 2007-9 is invalid to the *575 extent it forbids the inclusion of a prevailing wage requirement in ... Vista construction contracts in excess of $1,000, such as [the two new fire station] projects."
Vista answered the petition, and the parties filed memoranda of points and authorities.
In support of its position, SBCTC argued the PWL addressed a matter of statewide concern and thus Vista's decision to award public works contracts was not a "municipal affair" superseding all inconsistent state laws, regardless of whether the public works project at issue was a project of the municipality. (See art. XI, § 5.)
In opposing the petition, Vista argued SBCTC's challenge was premature and the controversy was "not ripe for adjudication" because SBCTC had not demonstrated "a current legal dispute." With respect to the merits, Vista argued, among other contentions, that the trial court was bound by long-standing precedent which has consistently held that the PWL does not embrace matters of statewide concern.
The trial court rejected Vista's argument that the controversy was not sufficiently ripe for resolution. The trial court noted Vista had approved certain public works project contracts under Vista Ordinance No. 2007-9 without complying with the PWL, including contracts for the construction of the two fire stations.[4]
Nonetheless, on the merits of the petition, the trial court agreed with Vista that existing precedent did not require that the city comply with the PWL and denied SBCTC's petition for peremptory writ of mandate.
SBCTC filed a timely notice of appeal from the judgment.

*576 DISCUSSION

I

The Controversy Presented in This Action Is Ripe for Adjudication
As a threshold matter, we reject Vista's argument that we should not decide the matter presented in this appeal because SBCTC "has brought a premature action that does not challenge any particular contract or language in Vista codes."
Vista argues that SBCTC's action is premature because "[t]his case has no concrete project, wage determination or specific fact pattern at issue." Vista asserts that SBCTC "cannot point to the performance of any act that Vista has violated wherein action must be compelled" and that SBCTC "has failed to allege any contract being let, or other action in violation of any California Labor Code provision it seeks to enforce" so that "there is no current legal dispute, only a potential future dispute." Furthermore, Vista claims that SBCTC's petition presents a "facial attack" to Vista Ordinance No. 2007-9 because it seeks a ruling that Vista must comply with the prevailing wage laws for all of its public works projects. According to Vista, this lawsuit impermissibly asserts a facial challenge based on a "hypothetical future situation[]." (See, e.g., Pacific Legal Foundation v. California Coastal Com. (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306] (Pacific Legal Foundation) [when a lawsuit involves a "facial challenge" to administrative regulations, "we must first determine that the issues raised are sufficiently concrete to allow judicial resolution even in the absence of a precise factual context"].)
(1) Vista's argument is essentially a challenge to the ripeness of this controversy. "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions." (Pacific Legal Foundation, supra, 33 Cal.3d at p. 170.) "It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion," and it "is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (Ibid.) "`The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citation.] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" (Id. at pp. 170-171.)
*577 Here, a real and substantial controversy has arisen between the parties. Vista has demonstrated, in several ways, that it does not intend to comply with the PWL: (1) it has adopted a city charter specifically for the purpose of building its planned capital improvements without complying with the PWL; (2) it has enacted Vista Ordinance No. 2007-9, which specifically provides that Vista is not required to follow the PWL unless the project at issue is not merely a municipal affair or the state or federal grants connected to the project require that the PWL be followed; (3) it is proceeding with its capital improvement projects and has approved design-build contracts for the first of those improvementsthe two fire stationswithout including within those contracts provisions required by the PWL; and (4) it has taken a litigation position here that it is not required to follow the prevailing wage law for projects paid for by local funds. SBCTC has made clear that it disputes Vista's refusal to follow the PWL, and it is seeking relief consistent with that view. Specifically, SBCTC seeks an order that would (1) require Vista to comply with the PWL for all public works projects over $1,000, specifically and expressly including the construction of the two fire stations; and (2) declare Vista Ordinance No. 2007-9 to be invalid to the extent it forbids Vista to comply with the PWL for such contracts.
Under these circumstances, we are presented with a definite controversy that arises out of the parties' adverse positions and is based on a concrete set of facts, not merely a hypothetical future situation. Judicial relief is appropriate because we are easily able "to make a decree finally disposing of the controversy" (Pacific Legal Foundation, supra, 33 Cal.3d at p. 170) by simply addressing the main disputed legal issue, namely, whether the PWL is a matter of statewide concern such that Vista, as a charter city, is bound to comply with it regardless of the purely local character of its public works projects. We thus proceed to consider the merits of SBCTC's petition.

II

Article XI, Section 5 of the California Constitution

A. Evolution of "Home Rule"

Article XI, section 5 of the California Constitution provides in pertinent part "[c]ity charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith." (Italics added.) As the court pointed out in Johnson v. Bradley (1992) 4 Cal.4th 389, 395-397 [14 Cal.Rptr.2d 470, 841 P.2d 990], the "home rule" powers established by article XI, section 5 of the California Constitution have their roots in the experience of municipalities following adoption of the California Constitutions of 1849 and 1879, under which a *578 charter city's power to legislate was subordinate to the power of the Legislature to pass general laws. (4 Cal.4th at p. 395.) In 1896 the California Constitution was amended to create an exception to the preemptive character of state law for the "municipal affairs" of charter cities. (4 Cal.4th at p. 395.) "The lead opinion in Fragley v. Phelan (1899) 126 Cal. 383 [58 P. 923], discussed `the reasons which moved the legislature to propose the amendment [to California Constitution, article XI, former section 6], and the people to adopt it. What was the evil to be remedied? What was the good to be gained by this amendment? The answer is common, every-day history. It was to prevent existing provisions of charters from being frittered away by general laws. It was to enable municipalities to conduct their own business and control their own affairs to the fullest possible extent in their own way. It was enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.... This amendment, then, was intended to give municipalities the sole right to regulate, control, and govern their internal conduct independent of general laws ....' [Citation.]" (Johnson v. Bradley, supra, 4 Cal.4th at pp. 395-396.)
In 1914 the California Constitution was amended again and provided that the municipal affairs exception applied not just to matters set forth as such in a city charter but to all laws and regulations adopted by cities with respect to their municipal affairs. (Johnson v. Bradley, supra, 4 Cal.4th at p. 396.) In substance, this version of the municipal affairs exception was readopted by the voters in 1970 and now appears as article XI, section 5 of the California Constitution. (4 Cal.4th at p. 397.)

B. Application of Municipal Affairs Clause

As our Supreme Court itself has conceded, although more than a century has passed since the municipal affairs clause was placed in the California Constitution, the phrase has "defeated efforts at a defining formulation" of its content. (California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 6 [283 Cal.Rptr. 569, 812 P.2d 916] (California Federal).) Nonetheless, the court in California Federal has provided us with important and binding analytical principles.
In California Federal the court considered a 1979 amendment to the Revenue and Taxation Code, by which the Legislature declared that a state income tax on all financial corporations, including savings and loan associations, was in lieu of all other taxes and license fees, including business license taxes imposed by charter cities. National banks were provided such an *579 exemption from local taxes and fees by the California Constitution. (Cal. Const., art. XIII, § 27.)
The City of Los Angeles, a charter city, imposed an annual business license tax on businesses within its boundaries and collected the tax from a savings and loan association which had its headquarters in the city. The savings and loan association sued the city in an effort to obtain a refund of the tax. The city, relying on a number of cases which upheld the power of charter cities to impose various taxes and fees, argued a city's tax measures were inflexibly "municipal affairs" and thus, unlike municipal regulations, invariably immune from state legislative supremacy. The trial court conducted a bench trial and determined that the record presented by the parties supported findings by the Legislature that taxation of financial institutions was a matter of statewide concern. The Court of Appeal reversed the trial court and upheld the city's right to impose the tax on the savings and loan association. The Supreme Court granted review and reversed the Court of Appeal. Like the trial court, the Supreme Court found that protecting financial institutions from undue tax burdens was a matter of statewide concern.
"Although municipal taxation is a `municipal affair' within the meaning of article XI, section 5(a), in that it is a necessary and appropriate power of municipal government, aspects of local taxation may under some circumstances acquire a `supramunicipal' dimension, transforming an otherwise intramural affair into a matter of statewide concern warranting legislative attention. In short, our cases do not support the distinction drawn by the Court of Appeal; charter city tax measures are subject to the same legal analysis and accumulated body of decisional law under article XI, section 5(a), as charter city regulatory measures. In the event of a true conflict between a state statute reasonably tailored to the resolution of a subject of statewide concern and a charter city tax measure, the latter ceases to be a `municipal affair' to the extent of the conflict and must yield. In addition, we hold that under the circumstances of this case the trial court correctly concluded that the aggregate intrastate tax burden on financial corporations including local taxes such as the City's business license taxis a subject of statewide concern." (California Federal, supra, 54 Cal.3d at p. 7.)
(2) In discussing how it reached its conclusion the city's business tax was not immune from regulation by the Legislature, the court set out the analytical process by which courts should confront "home rule" disputes. "In broad outline, a court asked to resolve a putative conflict between a state statute and a charter city measure initially must satisfy itself that the case presents an actual conflict between the two. If it does not, a choice between *580 the conclusions `municipal affair' and `statewide concern' is not required.... To the extent difficult choices between competing claims of municipal and state governments can be forestalled in this sensitive area of constitutional law, they ought to be; courts can avoid making such unnecessary choices by carefully insuring that the purported conflict is in fact a genuine one, unresolvable short of choosing between one enactment and the other.
(3) "In those cases where the preliminary conditions are satisfied, that is, where the matter implicates a `municipal affair' and poses a genuine conflict with state law, the question of statewide concern is the bedrock inquiry through which the conflict between state and local interests is adjusted." (California Federal, supra, 54 Cal.3d at pp. 16-17.) When a genuine conflict arises, a court must consider first whether the state law qualifies as a matter of "statewide concern." (Ibid.) If the state law does not qualify as a matter of statewide concern, the conflicting city measure is a "`municipal affair' and `beyond the reach of legislative enactment.'" (Id. at p. 17.) On the other hand, if the state statute qualifies as a statewide concern, a court must next consider whether it is both (i) reasonably related to resolution of that concern, and (ii) narrowly tailored to limit incursion into legitimate municipal interests. (Ibid.; see also Johnson v. Bradley, supra, 4 Cal.4th at p. 404.)
(4) In determining whether an act of the Legislature supersedes a conflicting municipal enactment, the court in California Federal cautioned that "courts should avoid the error of `compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a `municipal affair' or one of statewide concern. Beginning with the observation in Pac. Tel. & Tel. Co. v. City and County of S.F. [(1959)] 51 Cal.2d [766,] 771 [336 P.2d 514], that `the constitutional concept of municipal affairs is not a fixed or static quantity ... [but one that] changes with the changing conditions upon which it is to operate,' our cases display a growing recognition that `home rule' is a means of adjusting the political relationship between state and local governments in discrete areas of conflict. When a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city." (California Federal, supra, 54 Cal.3d at pp. 17-18.)
(5) Importantly, the court instructed us that a corollary of the proposition that the California Constitution contemplates a continuing mediation of competing interests, rather than a fixed and immutable demarcation of those interests, is the principle that a decision favoring a charter city measure does *581 not "preclude superseding state legislation in a later case if the fact-bound justificationthe statewide dimensionis subsequently demonstrated." (California Federal, supra, 54 Cal.3d at p. 18, italics added.) Thus, "[i]n cases presenting a true conflict between a charter city measurewhether tax or regulatoryand a state statute, therefore, the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations." (Ibid.)
Of significance to us, the court in California Federal also discussed the nature of the record which supported its conclusion that taxing financial institutions was a matter of statewide concern. First the court noted the Legislature made express findings that, to promote competition among banks and other financial institutions and thereby afford the state with a full range of financial services, it was necessary to treat all financial institutions in the state in a uniform manner and that existing divergent and competing local tax measures impaired such uniformity. (California Federal, supra, 54 Cal.3d at p. 10, fn. 8.)
(6) With respect to the Legislature's findings the court reaffirmed the principle that, while not controlling, legislative determinations are entitled to deference. In Bishop v. City of San Jose (1969) 1 Cal.3d 56, 63, footnote 6 [81 Cal.Rptr. 465, 460 P.2d 137], the court discussed the weight courts should accord legislative findings, and in California Federal the court reiterated the Bishop v. City of San Jose formulation: "Our statement in Bishop v. City of San Jose, supra, 1 Cal.3d at page 63, that `the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern,' meant that legislative declarations that a subject is one of statewide concern do not ipse dixit make it so; we exercise our `independent judgment' as to that issue, giving `great weight' to legislative statements of purpose where they exist. [Citation.]" (California Federal, supra, 54 Cal.3d at p. 24, fn. 21.)
Second, the court noted that the trial court had considered several days of testimony by experts in the fields of economics and banking regulation as well as a considerable number of congressional reports and studies which set forth the then evolving economic and regulatory environment affecting the savings and loan industry. (California Federal, supra, 54 Cal.3d at pp. 20-22.) The court found that the large volume of evidence in the record fully supported the Legislature's conclusion that the well-being of the state's savings and loan industry depended upon a uniform system of taxation. (Ibid.)
*582 (7) In rejecting the city's argument that there was no persuasive justification for the legislative change because the preexisting systemunder which savings and loan associations were allowed to offset the amounts paid in local taxes against their state income taxeshad worked well for a number of years, the court identified the central question to be resolved when considering whether a particular issue presents a matter of statewide concern: "[T]he [c]ity's argument proves too much. The question is not whether the amendment of section 23182 was prudent public policy or whether the municipal tax burden on savings banks has sufficient impact on the industry's financial health to make the change to a net income tax system an advisable or effective measure. The issue is whether the income tax burden on financial corporations, especially savings banksincluding the component imposed by municipalitiesis of sufficient extramural dimension to support legislative measures reasonably related to its resolution." (California Federal, supra, 54 Cal.3d at pp. 23-24, italics added.)
(8) Finally, the court took pains to recognize that resolution of a conflict between state law and a municipal enactment in any particular case was necessarily subjective and flexible: "The approach to that demanding task historically taken in our cases has been one of ad hoc intuition informed by pragmatic common sense rather than a rigid fidelity to some theoretical model. In an area of constitutional law so deeply marked from the beginning by conceptual uncertainty and inherent factual ambiguity, we should not expect doctrinal tidiness: `constitutions,' as Justice Holmes said, `are intended to preserve practical and substantial rights, not to maintain theories.' [Citation.]" (California Federal, supra, 54 Cal.3d at p. 25.)
California Federal did not in any sense represent an expansion of the power of the Legislature over charter cities. Indeed one year later, adhering to the very analytical approach set forth in California Federal, the court found that a statewide initiative prohibiting public financing of political campaigns did not apply to a charter city whose voters had approved public financing of municipal elections. (See Johnson v. Bradley, supra, 4 Cal.4th at pp. 410-411.)
(9) As required by California Federal, the court in Johnson v. Bradley considered whether the city charter provision conflicted with the state law and found that it did. Importantly, for our purposes, the court then turned to the challengers' contention that the use of any public funds by any municipality was a matter of statewide concern. In rejecting this argument, the court stated: "On this point, we agree with the Court of Appeal below, which observed, `[W]e can think of nothing that is of greater municipal concern than how a city's tax dollars will be spent; nor anything which could be of less interest to taxpayers of other jurisdictions. [Charter section 313, subdivision (C)4] expressly limit[s] the monies to be utilized for campaign financing *583 to city funds. Thus, payments received by the city from state or federal governmental agencies may not be used. These are the city taxpayers' own dollars and those taxpayers, together with their city council, have voted to utilize those dollars to help finance political campaigns for city elective offices as a central if not critical part of major political campaign and ethics reform. That Proposition 73 expressly dealt with this subject and intended that its prohibition extend to campaigns and candidates for local office does not convert the decision of the City of Los Angeles, to follow a different path with its own money, into a matter of statewide concern.'" (Johnson v. Bradley, supra, 4 Cal.4th at p. 407.)[5]

III

PWL
The predecessor to the PWL, the Public Wage Rate Act, was enacted in 1931. (Stats. 1931, ch. 397, p. 910.) By its terms the Public Wage Rate Act covered contracts for construction of public works let by "any county, city and county, city, town, township, district or other political subdivision" of the state. (Stats. 1931, ch. 397, p. 910.) It required that any contracting body ascertain the prevailing per diem wage for construction trades in the locality where the work was to be performed and required bidders on the project to pay their employees that wage. (Ibid.) Under the Public Wage Rate Act, the term "locality" was defined as the territorial limits of the public body awarding the contract. (Stats. 1931, ch. 397, p. 912.) The decision of the public body as to the prevailing rate in its locality was final. (Ibid.)
The Public Wage Rate Act was subject to two challenges. In Metropolitan Water Dist. v. Whitsett (1932) 215 Cal. 400 [10 P.2d 751], a water district challenged it on the grounds, among others, the act imposed an unlawful tax on the district. In rejecting this argument, the court determined the act was essentially a minimum wage law: "Under all of the authorities cited, or which have come to our notice, it is uniformly held that the legislature itself, unless constitutionally restrained, may fix in a definite amount the minimum wage for labor on public work." (Id. at pp. 417-418, italics added.)
*584 Of more direct import here, in a companion case, City of Pasadena v. Charleville (1932) 215 Cal. 384, 389 [10 P.2d 745] (Charleville), a charter city argued that, as applied to a contract for a fence around a municipal reservoir, the Public Wage Rate Act was an unconstitutional intrusion into the city's power over municipal affairs. The Supreme Court agreed with the city: "It must also be concluded that the improvement contemplated by the contract in question is a municipal affair. The sole purpose of the contract is the construction of a wire fence around a reservoir which is a part of the city's municipal water system. The supplying of the water by a city to its inhabitants is a municipal affair. [Citation.] The building of a dam to be used for impounding water for a municipal water system is a municipal affair. [Citation]. The construction of a reservoir as a part of a municipal water system is a municipal affair. [Citation.] The money to be expended for the cost of the improvement belongs to the city and the control of its expenditure is a municipal affair. The hiring of employees generally by the city to perform labor and services in connection with its municipal affairs and the payment of the city's funds for services rendered to the city by its employees in the administration of its municipal affairs is not subject to or controlled by general laws." (215 Cal. at p. 389.)
In 1937 the Public Wage Rate Act was replaced by the PWL as set forth in section 1720 et seq. As enacted in 1937, and notwithstanding the holding in Charleville, PWL applies to "improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether the political subdivision or district operates under a freeholder's charter or not." (§ 1720, subd. (a)(3), italics added; see Stats. 1937, ch. 90, p. 241.)
Unlike the Public Wage Rate Act, under the PWL the prevailing wage is ascertained by the Director of the Department of Industrial Relations by reference to "collective bargaining agreements and the rates that may have been predetermined for federal public works, within the locality and in the nearest labor market area." (§ 1773.)[6] Also in 1937 the Legislature added to the PWL a provision, section 1777.5, which permitted public contractors to employ apprentices with whom they had entered apprenticeship agreements under the then current version of section 3077. Later, in 1939, section 3077 was replaced with a new version of section 3077, which established a comprehensive apprenticeship training program for construction trades and the PWL was amended to permit public contractors to employ apprentices *585 who were participating in an apprenticeship program approved by Chief of the Division of Apprenticeship Standards. (See Stats. 1939, ch. 220, § 2, pp. 1472-1473; Stats. 1939, ch. 971, p. 2723.)
The PWL is only one part of a larger scheme set forth in the Labor Code, which has as its overall purpose the protection of all the state's workers. The purpose of the Labor Code and its regulation of both private and public employers is set forth in section 90.5, subdivision (a), which declares that it is the public policy of California "to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards." (See also Lusardi Construction Co. v. Aubry (1992) 1 Cal.4th 976, 985 [4 Cal.Rptr.2d 837, 824 P.2d 643] (Lusardi).)
(10) The purpose of the PWL is considerably narrower than protecting the health, safety and well-being of all the state's workers. Rather, as the court explained in O. G. Sansone Co. v. Department of Transportation (1976) 55 Cal.App.3d 434, 458 [127 Cal.Rptr. 799], the limitations imposed by the PWL are designed to ensure that contractors who enter into collective bargaining agreements can compete for public works contracts: "Little has been written in judicial opinions concerning the purpose of the California legislation. However, cases have expounded on the purpose of the Davis-Bacon Act. (40 U.S.C. § 276a et seq.) The Supreme Court stated in U.S. v. Binghamton Construction Co., 347 U.S. 171, at pages 176-177 [98 L.Ed. 594, 74 S.Ct. 438]: `The language of the [Davis-Bacon] Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects.' And in International U. of Operating Eng. Local 627 v. Arthurs (W.D. Okla. 1973) 355 F.Supp. 7, at page 8, it was stated: `The purpose of the Davis-Bacon Act is to provide protection to local craftsmen who were losing work to contractors who recruited labor from distant cheap-labor areas. [Citation.] Some contractors pay wages according to collective bargaining agreements. But even though these contractors usually are required to pay higher wage scales, they can still compete with nonunion contractors for public contract work because of the Davis-Bacon Act prevailing wage scale provision. Noncompliance with the Davis-Bacon Act makes it impossible for all contractors to compete. There is thus injury to the laborers and mechanics, as well as injury to contractors and labor organizations.'" (O. G. Sansone Co., at p. 458, fn. omitted.) Thus, "[t]he overall purpose of the prevailing wage law is to protect and benefit employees on public works projects." (Lusardi, supra, 1 Cal.4th at p. 985, citing O. G. Sansone Co., supra, 55 Cal.App.3d at p. 458.)
*586 Notwithstanding statements to the effect the PWL is to be liberally construed, courts have also consistently recognized that in any number of contexts the PWL may impose unwarranted costs on socially desirable activities and the Legislature could rationally decide that in a particular context the cost of extending the scope of the law outweighs its benefits. (See, e.g., City of Long Beach v. Department of Industrial Relations (2004) 34 Cal.4th 942, 950 [22 Cal.Rptr.3d 518, 102 P.3d 904]; State Building & Construction Trades Council of California v. Duncan (2008) 162 Cal.App.4th 289, 324 [76 Cal.Rptr.3d 507]; McIntosh v. Aubry (1993) 14 Cal.App.4th 1576, 1586-1587 [18 Cal.Rptr.2d 680]; International Brotherhood of Electrical Workers v. Board of Harbor Commissioners (1977) 68 Cal.App.3d 556, 562 [137 Cal.Rptr. 372].) The major exception to application of the PWL is the statute's obvious exclusion of private construction contracts which do not involve the expenditure of public funds. (See City of Long Beach v. Department of Industrial Relations, supra, 34 Cal.4th at p. 954; see also Williams v. SnSands Corp. (2007) 156 Cal.App.4th 742, 754 [67 Cal.Rptr.3d 606].) This basic exception to application of the law is, for us, telling. The protection which the PWL provides to workers is plainly not so vital a part of the state's larger overall goal of protecting the state's workers that it applies generally to all construction contracts. Thus, at its most basic level, the dimensions of the policies advanced by the PWL are limited.
However, in addition to the exclusion of purely private construction contracts, the Legislature has also excluded from application of the PWL a number of agreements between public agencies and private entities which involve substantial levels of construction activity and public support. In State Building & Construction Trades Council of California v. Duncan a local redevelopment agency made an agreement with a developer under which the developer agreed to acquire and rehabilitate a 117-unit apartment building and rent the individual units to persons earning no more than 60 percent of the area median income. In exchange, the redevelopment agency and the state provided the $18.6 million in financing the developer needed for the project as well as $600,000 in low income housing tax credits (LIHTC's) provided for under title 26, United States Code, section 42, and Health and Safety Code sections 50199.8 and 50199.10. The state's allocation of the tax credits is the state's principal instrument for increasing the supply of low-cost housing. (State Building & Construction Trades Council of California v. Duncan, supra, 162 Cal.App.4th at p. 297.)
Notwithstanding the role of the credits in making the project possible, the Director of the Department of Industrial Relations (the Director) determined the project was not covered by the PWL. The Director relied on section 1720, subdivision (d)(3), which expressly excludes from the PWL projects which have received LIHTC's. Construction trades unions challenged the Director's *587 determination and the court upheld the Director: "There are weighty arguments and worthy goals arrayed on each side. Trades Council and the Treasurer, citing the rule of liberal construction traditionally afforded the prevailing wage law [citations], see the issue as the threatened frustration of the clear statutory mandate to apply the prevailing wage law to a category of residential construction that would not exist but for the gift of LIHTC's. The Director, Housing Development, the Building Industry Association, and the Redevelopment Association are eloquent in describing what they perceive will be the adverse impact of extending the prevailing wage law to future projects, thereby reducing the willingness of developers to expand the stock of low-income housing. These are issues of high public policy. To choose between them, or to strike a balance between them, is the essential function of the Legislature, not a court." (State Building & Construction Trades Council of California v. Duncan, supra, 162 Cal.App.4th at p. 324.)
In reaching its conclusion about what kind of public support triggers application of the PWL, the court in State Building & Construction Trades Council of California v. Duncan relied on its earlier opinion in McIntosh v. Aubry, supra, 14 Cal.App.4th 1576. In McIntosh v. Aubry Riverside County wanted to encourage establishment of a privately operated residential care facility for disturbed or abused minors. In its effort to establish such a facility the county agreed with a private entity, Helicon, to sublease to Helicon a portion of an undeveloped tract of land over which the county held a long-term ground lease. Under the terms of the sublease Helicon would pay no rent for the first 20 years and would construct the care facility at its own expense. The county further agreed to place children in the facility and pay Helicon for their care. In addition to the rent forbearance and agreement to pay for the care of children placed in Helicon's facility, the county agreed to waive certain inspection costs it typically charged developers and to advance the cost of performance and payment bonds. Helicon entered into a construction contract with a general contractor which did not require the compliance with the PWL. The court held that, notwithstanding the fairly substantial financial incentives the county provided, the project did not involve the use of public funds within the meaning of the PWL. "A theme recurrent in plaintiffs' briefing is that aspects of this case (rent forbearance, inspection costs, bond premiums, public purpose) have a `cumulative' effect warranting public-works status even if the individual aspects do not. We reject that approach as unworkable. Parties must be able to predict the public-works consequences of their actions under reasonably precise criteria and clear precedent. Subdivision (a) of section 1720 would become a quagmire under plaintiffs' approach, the only certain result being constant litigation. The Legislature has formulated precise criteria tailored to many situations in this *588 area ... and is uniquely suited to balance and address the several policy concerns raised here." (McIntosh v. Aubry, supra, 14 Cal.App.4th at p. 1593.)[7]
In International Brotherhood of Electrical Workers v. Board of Harbor Commissioners, supra, 68 Cal.App.3d 556 the court considered an agreement by which a city agreed to permit a private party to develop oil wells on tidelands the city held in trust. Under the agreement, the developer would construct all the improvements needed to develop the oil wells and pay the city all the revenue from the oil operations, less its expenses and a percentage of the profits. The developer then entered into a contract for construction of facilities it needed in order to develop the oil wells. According to the plaintiff labor union, the contract did not comply with the PWL.
The union sued the city and argued that the underlying agreement between the city and the developer was a public works contract within the meaning of the PWL. The court found that the development agreement was not governed by the PWL. "Although unique in its provisions, it is, in essence, an oil and gas lease, calling for payment of royalties to the city. Development is obligated to drill for, produce and sell oil and gas from the tidelands involved. It operates at its own risk, since the city is not obligated to reimburse Development for any losses incurred in the operations. The city's only interest is in receiving its percentage of the oil and gas produced and sold. The fact that royalties are to be computed in a manner different from the ordinary oil and gas lease does not make the contract anything other than a lease." (International Brotherhood of Electrical Workers v. Board of Harbor Commissioners, supra, 68 Cal.App.3d at p. 562.)
(11) As the holdings in State Building & Construction Trades Council of California v. Duncan, McIntosh v. Aubry, and International Brotherhood of Electrical Workers v. Board of Harbor Commissioners illustrate, the Legislature has been willing to permit not only private agreements which do not comply with the PWL, but also a fairly substantial number of publicly supported contracts which do not comply with the requirements of the statute. Thus, not only are the dimensions of the policy the PWL seeks to advance limited in that the statute only applies to the public-sector portion of the larger building industry but, even with respect to public-sector construction, application of the policy is fairly elastic.
*589 Given the statute's limited scope and elastic features, and consistent with the holding in Charleville, our courts have repeatedly held that other attempts by the Legislature to set the salaries of other public agencies and charter cities are not matters of statewide concern. In Sonoma County Organization of Public Employees v. County of Sonoma (1979) 23 Cal.3d 296, 316-317 [152 Cal.Rptr. 903, 591 P.2d 1] (Sonoma County), the court considered a legislative attempt to limit the salaries paid by charter cities and counties receiving state funds in the wake of the adoption of Proposition 13 by the voters in June 1978. In finding the salary limitation violated California Constitution article XI, section 5, the court, relying on Charleville, stated: "[T]he salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws. [Citations.] . . . [T]he determination of the wages paid to employees of charter cities as well as charter counties is a matter of local rather than statewide concern." (23 Cal.3d at p. 317.)
In San Francisco Labor Council v. Regents of University of California (1980) 26 Cal.3d 785, 790 [163 Cal.Rptr. 460, 608 P.2d 277] (San Francisco Labor Council), the Supreme Court considered a provision of the Education Code which required that the Regents of the University of California (the Regents) pay laborers, workmen, and mechanics a prevailing wage analogous to the prevailing wage required under the PWL. The Regents argued that, in light of their independent status under article IX, section 9 of the California Constitution, the Legislature had no power to regulate salaries paid to university employees. The Supreme Court agreed with the Regents. The court noted that unlike a minimum wage statute, which applies to both public and private employers, a prevailing wage statute is not generally applicable to private employers. (San Francisco Labor Council, at p. 790.) Moreover, the court found: "[O]ur recent decision in Sonoma County Organization of Public Employees v. County of Sonoma[, supra,] 23 Cal.3d 296 ..., leads us to conclude a prevailing wage requirement is not a matter of statewide concern." (Ibid.)
While the opinions in Sonoma County and San Francisco Labor Council do not directly consider the PWL, they have been relied upon by more recent PWL cases. In Vial v. City of San Diego (1981) 122 Cal.App.3d 346, 348 [175 Cal.Rptr. 647] (Vial), we held that, as a charter city, the City of San Diego was not subject to the PWL. We relied on Charleville and noted that in Sonoma County the Supreme Court had recently reaffirmed the principle set forth in Charleville. (Vial, supra, 122 Cal.App.3d at p. 348, fn. 1.)
(12) Likewise, in Regents of University of California v. Aubry (1996) 42 Cal.App.4th 579, 590-591 [49 Cal.Rptr.2d 703], the court held that the Regents were not required to comply with the PWL with respect to the construction of student housing from non-state-appropriated funds. "The prevailing wage law is not universally applied. Chartered cities are exempt from it, *590 at least in areas not involving statewide concern. While such cities may choose to pay prevailing wages in such situations, they are free to balance the competing policies of paying prevailing wages against those of serving public needs at lower costs by not doing so. Likewise, UC may further its core educational function by not paying prevailing wages, as in this case. Thus, we follow the holding of [San Francisco Labor Council], and hold that these projects can proceed without a prevailing wage requirement because they do not involve matters of statewide concern and involve internal UC affairs vital to its core educational function." (Regents of University of California v. Aubry, supra, 42 Cal.App.4th at pp. 590-591.)[8]
The unwillingness of these cases to find that the PWL embodies a matter of statewide concern is not surprising so long as we keep in mind the fact the statute is not designed to raise or set local wages and working conditions, but rather to keep state contracting from undermining what local labor markets have established. (See O. G. Sansone Co., supra, 55 Cal.App.3d at p. 458.) At its core, the PWL is not a mandate, but a restraint on the manner in which the state spends its resources. This of course is the import of the Legislature's decision that the PWL does not apply to private contracts: under the PWL, local labor markets determine wages and working conditions by way of local bargaining between private contractors and employees without interference from the Legislature. Contrary to SBCTC's argument, our Legislature's decision to restrain the impact of state spending on local labor markets does not compel the conclusion that any other impact on those markets is a matter of statewide concern. Viewed in this context, it is easy to understand why the cases have consistently found that, while a proper exercise over the manner in *591 which state funds are employed, the PWL does not touch upon matters of statewide concern sufficient to outweigh the power of charter cities over their municipal affairs.

IV

Resolution of the Conflict Between the PWL & Vista's Contracting Ordinance
As we have noted, by way of its adoption of an ordinance, Vista has attempted to relieve itself of any obligation to comply with the PWL with respect to projects financed solely from city revenue. Vista's attempt to avoid application of the PWL is in direct conflict with the PWL, which, from the time the statute was enacted in 1937, has expressly applied to charter cities. (See § 1720, subd. (a)(3); Stats. 1937, ch. 90, p. 241.) Thus, this is not a case where we can avoid consideration of the municipal affairs doctrine by way of construing either the local enactment or the state statute in a manner which averts such a conflict. (See California Federal, supra, 54 Cal.3d at pp. 16-17.)
Because there is a genuine conflict between Vista's contracting ordinance and the PWL, we must consider first whether the PWL addresses a matter of statewide concern. Only after we have found a statewide concern are we required to determine whether the PWL addresses it in a manner reasonably related to that concern and narrowly tailored to limit incursion on legitimate municipal interests. (See Johnson v. Bradley, supra, 4 Cal.4th at p. 404.)
(13) For a host of reasons, we find the matters the PWL addresses are not matters of statewide concern. That is to say, the wages paid on local public works projects are not matters of sufficient extramural dimension to support legislative intervention. We begin by reiterating the unambiguous statement of the court in Johnson v. Bradley: "`[W]e can think of nothing that is of greater municipal concern than how a city's tax dollars will be spent; nor anything which could be of less interest to taxpayers of other jurisdictions.'" (Johnson v. Bradley, supra, 4 Cal.4th at p. 407.) This statement largely articulates one of the principal rationales underlying the cases which have consistently rejected application of the PWL to charter cities or other independent agencies. (See Charleville, Vial and Regents of University of California v. Aubry; see also Sonoma County and San Francisco Labor Council.) Plainly, over the last nearly 80 years, courts have found that as a practical matter a municipality's public works spending decisions are a matter of fundamental importance to the municipality and of limited importance to either the state or neighboring jurisdictions.
*592 However, that does not end our analysis. As the court in California Federal instructed, we must resist the temptation to determine that particular kinds of municipal decisions are either categorically insulated from regulation by the Legislature or categorically subject to it. (California Federal, supra, 54 Cal.3d at pp. 17-18.) Where, as here, previous decisions have favored municipal power over state regulation, the Legislature may nonetheless intervene at a later point if a fact-bound justification is subsequently demonstrated. (Id. at p. 18.) Thus, in the end, the question we face is whether either the Legislature or the SBCTC have demonstrated a fact-bound justification for application of the PWL to charter cities. As we explain more fully, we do not find any such justification on the record presented.[9]
The biggest hurdle to any departure from the holdings in Charleville and the cases which have consistently followed it, is the fact that, in its essential dimensions, the PWL has not changed since its enactment. As was the case with its predecessor, the Public Wage Rate Act, and as has been the case since the PWL itself was enacted in 1937, the PWL does not regulate private construction contracts. Given the fact that any number of charter cities in this state are of modest size and population, and, until quite recently, given the size of just the homebuilding portion of the construction industry, it does not take undue speculation to recognize that in any given locality the volume of private construction activity is likely to match or exceed the volume of a municipality's public works contracts. As has been the case since the PWL was enacted, in this factual context, it is difficult to conclude the extraterritorial impact of a municipality's contracting practices is significant and substantial enough to warrant subordination of a municipality's power over its spending, when the Legislature itself has determined that no regulation is necessary with respect to what, in any particular area, might be an equal or a far larger volume of private contracting.
We of course recognize that a municipality's public works spending is likely to have an impact beyond its borders. Obviously, any given public works project is likely to require labor and material from beyond a particular municipality's borders. However, the standard we apply here is not whether the spending has any impact beyond a municipality's borders. In our fluid economy, all spending by a municipality, whether for public works or other matters, is likely to have an impact beyond its borders. Thus, an expansive standard which permitted legislative action whenever municipal spending has an extraterritorial impact would permit legislative intervention in virtually all aspects of municipal governance. That of course is precisely the standard and *593 the result the court in Johnson v. Bradley rejected. (See Johnson v. Bradley, supra, 4 Cal.4th at p. 407.)
(14) Rather, in considering whether an area of conflicting state and municipal taxation or regulation truly involves a matter of statewide concern, we must consider whether the extraterritorial impact of a city's taxation or regulation as a practical matter interferes in a substantial way with a policy the Legislature is attempting to advance. This of course brings us back to the fact that the PWL is not a law of general application. As we have discussed, the PWL represents a legislative determination that state contracting have no impact on local collective bargaining agreements. The practical reality which the holdings in Charleville, Sonoma County, San Francisco Labor Council, Vialand Regents of University of California v. Aubry appear to recognize is that the state government's determination, that its contracting be labor neutral, is not undermined by the desire of other agencies and municipalities to obtain public works at the lowest possible cost.
In addition to the difficulty posed by the fact that the PWL is not a law of general application, in light of the court's holding in California Federal, we think it is also important to recognize the policies advanced by the PWL are not matters which require uniform treatment. Unlike the detailed and comprehensive system of taxation considered in California Federal, in which one city's variance could thwart a carefully balanced legislative scheme, as we have seen the Legislature itself has enacted a number of exceptions to application of the PWL to publicly supported construction projects. The elasticity we see in those legislative exceptions substantially undermines any suggestion the overall policy of the law would be undermined by a municipality's determination the PWL does not apply to a particular project.[10]
We recognize the SBCTC relies to a great extent on the fact that in addition to providing a mechanism for setting wages, the PWL also plays a major role in the state's apprenticeship training program. (See § 1777.5 et seq.) However, application of this aspect of the PWL to charter cities faces the same hurdles the statute as a whole faces: the apprenticeship requirements do not apply to the significant portion of the labor market devoted to private contracting and are subject to the very same exceptions the Legislature has created for the statute as a whole.
*594 Against what are the undeniable structural aspects of the PWLits lack of application to private contracts and its elasticitywe must weigh the Legislature's own statements about the need to have the law apply to charter cities and evidence in the record which supports that legislative determination. (See California Federal, supra, 54 Cal.3d at pp. 23-24.) In affirming its intent that the prevailing wage law should apply to charter cities because it viewed the law as a matter of statewide concern, the Legislature stated:
"WHEREAS, The Legislature has declared that the payment of prevailing wages on public projects is a matter of statewide concern; and
"WHEREAS, Payment of the prevailing rate of per diem wages to workers employed on public projects is necessary to attract the most skilled workers for the project and to ensure that work of the highest quality is performed on these projects; and
"WHEREAS, Public works projects should never undermine the wage base in a community and the requirement that workers on public works projects be paid the prevailing rate of per diem wages ensures that the local wage base is not lowered ...; and
"WHEREAS, The Court of Appeal held in City of Long Beach v. Department of Industrial Relations ...,[11] that the state's prevailing wage law addresses matters of statewide concern and therefore applies to projects subsidized by all public agencies, including chartered cities; and
"WHEREAS, The state's system for promoting quality apprenticeship training in the construction trades depends upon the incentives provided by the prevailing wage law; now, therefore, be it
"Resolved by the Senate of the State of California, the Assembly thereof concurring, That the Legislature reaffirms its intent for the state prevailing wage law to apply broadly to all projects subsidized with public funds, including the projects of chartered cities, as the law addresses important statewide concerns." (Sen. Conc. Res. No. 49 (2003-2004 Reg. Sess.), citations omitted.)
Given the structural contours of the PWL, the Legislature's determination that the PWL addresses matters of statewide concern, while entitled to deference, is not very helpful. As we have discussed, any consideration of the basic structure of the PWL and its exceptions leads to the conclusion that the *595 public works activities of a municipality are not likely to interfere in a material manner with the stability of any regional labor market. The Legislature's statement of intent does not offer any rationale which contradicts that conclusion. In this regard, the Legislature's PWL findings are in marked contrast to the finding the Legislature made with respect to the need for uniform taxation of savings and loans and considered by the court in California Federal. While the Legislature's findings with respect to the savings and loan industry set forth a clear rationale for preemption and uniformitythe need to promote a stable statewide competitive environmenthere, the Legislature has not articulated any rationale which would support the conclusion that complete preemption of municipal public works contracting is needed to protect regional labor markets. As the Supreme Court has stated, "legislative declarations that a subject is one of statewide concern do not ipse dixit make it so ...." (California Federal, supra, 54 Cal.3d 24, fn. 21.)
In addition to the legislative statement of intent, the record also contains a declaration from SBCTC's president, Robert Balgenorth. Balgenorth states that California-based construction workers typically move from project to project, and often move from contractor to contractor. Because of the construction industry's mobile workforce, local craft unions and district labor councils throughout the state have negotiated collective bargaining agreements that "provide for uniform hourly wages, regardless of the contractor employing the worker, and require contractors to contribute to the same multi-employer benefits plan." "This labor relations structure enables signatory contractors to respond to fluctuating demands for labor and enables construction workers to maintain steady employment and to receive health and pension benefits" even though they move between the jobsites of different contractors.
Balgenorth also states: "It is not uncommon for local construction workers in California to travel 50 miles or even 100 miles from their homes to the jobsite," and "It would be unusual in California today to find a construction project on which all the contractors and workers on the project are from the same city in which the project is located." Consistent with the mobile nature of the labor force, "[a] web of labor agreements sets the terms and conditions of employment for union construction workers throughout California. All or virtually all of these labor agreements cover geographic areas that are much larger than the boundaries of an individual city. These labor agreements typically set uniform terms and conditions of employment on a countywide, multi-county, or regional basis, depending on the craft and geographic area." "For example, the City of Vista would form only part of the geographic area covered by collective bargaining agreements for the construction trades in the area, and construction hiring halls would dispatch workers to jobsites throughout the county or region, not just in the City of Vista."
*596 The record also contains information with respect to the manner in which prevailing wages for the construction industry are set by the Director. The process employed by the Director "typically results in a prevailing wage rate that mirrors the wages negotiated in the corresponding master collective bargaining agreement." The prevailing wages set by the Director "[cover] geographic areas that are at least the size of an entire county," and "[p]revailing wage rates for the basic construction trades are typically published for an entire multi-county region or for the entire state."
Plainly, both the Balgenorth declaration and the Director's methodology establish that the labor markets in the construction trades are regional rather than local. However, what these parts of the record do not assist us with is in determining whether municipal public works contracting has a material impact on those markets. In this regard, the record here is again in marked contrast to the record considered in California Federal. As we have noted, in California Federal the trial court considered several days of expert testimony and a large volume of congressional reports and studies which described the economic and regulatory environment affecting the savings and loan industry and the necessity for the uniform treatment of savings and loans. (See California Federal, supra, 54 Cal.3d at p. 20, fn. 16.) That factual record permitted the court to conclude not only that the question of the aggregate taxation of savings and loans was a matter of statewide concern, but that the Legislature's resolution of the issue was narrowly tailored. (Id. at p. 24.) Here, in contrast, the factual record presented by the SBCTC offers no evidence which suggests the contracting activity of municipalities materially impacts regional labor markets.
We emphasize that our unwillingness to impose the PWL on municipalities does not arise out of any undue perception of our power to review legislative determinations. It is the face of the PWL itselfits lack of general application and its exceptionswhich prevent us from reaching such a result. Were we to ignore the actual provisions of the statute and the manner in which it operates, we would abdicate our responsibility to insure that municipalities are provided the protection given to them by article XI, section 5, subdivision (a) of the California Constitution.
In sum then, as currently drafted, the PWL does not address matters of statewide concern. Its limitations and exceptions persuade us that municipal public works projects do not have such an extramural dimension as would warrant legislative intervention in an otherwise strictly municipal affair. Having reached this conclusion, we need not address whether the PWL is *597 reasonably related to any statewide concern or narrowly tailored to avoid unnecessary incursion into legitimate areas of local concern.[12]

CONCLUSION
(15) Our conclusion the PWL does not touch upon matters of statewide concern should not be interpreted as any judgment as to whether the statute advances worthy objectives or whether it does so effectively. As is often the case, the question we face here is not whether the decision of a correlative branch or tribunal was wise, but whether a particular branch, agency or tribunal had the power to make the decision we are called upon to review. In light of California Constitution, article XI, section 5, subdivision (a), and in light of the manner in which the PWL operates, charter cities, not the Legislature, retain the power to determine whether the statute's provisions will govern their public works contracts.

DISPOSITION
The judgment of the trial court is affirmed.
Huffman, J., concurred.
IRION, J., Dissenting.
While I understand the great interest that a charter city has in deciding how its money is spent, I respectfully dissent from the majority's conclusion that charter cities are not required to comply with California's prevailing wage law (Lab. Code,[1] §§ 1720-1780) (the prevailing wage law) in constructing public works projects with municipal funds. I fundamentally disagree with my colleagues' analysis because it diverges from the analytical construct for the judicial mediation of jurisdictional disputes between charter cities and the Legislature set forth by our Supreme Court in California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916] (California Federal) and Johnson v. Bradley (1992) 4 Cal.4th 389 [14 Cal.Rptr.2d 470, 841 P.2d 990] (Johnson). Applying the proper legal framework to the facts in the record, I conclude that the City of Vista (Vista) is required to comply with the prevailing wage law. I would thus reverse the trial court and remand with directions that the trial court issue a peremptory writ of mandate in favor of State Building and Construction Trades Council of California, AFL-CIO (SBCTC).

*598 A. The Majority Applies the Wrong Analytical Construct

According to our Supreme Court, when analyzing whether a state law takes precedence over a charter city's conflicting enactment, a court must first focus on whether the Legislature's purpose for passing the state lawhere the prevailing wage lawreflects a matter of statewide concern.[2] The question is whether there is "a convincing basis for legislative action originating in extramunicipal concerns." (California Federal, supra, 54 Cal.3d at p. 18, italics added.) If the analysis shows that the Legislature's purpose for passing the law reflects a matter of statewide concern, the court then proceeds to the second and third inquiries, namely, (a) whether the law, as enacted, is reasonably related to advancing the Legislature's identified extramunicipal purpose (i.e., "reasonably related to the resolution of [the Legislature's] concern") (Johnson, supra, 4 Cal.4th at p. 404), and (b) whether the law is "`narrowly tailored' to limit incursion into legitimate municipal interests" (ibid.).
California Federal examined whether a law prohibiting municipal taxation of savings banks applied to charter cities. Our Supreme Court determined that the Legislature's purpose for enacting the law was to regulate the aggregate intrastate income tax burden on savings banks. (California Federal, supra, 54 Cal.3d at pp. 22-24.) It then focused on whether that purpose reflected a statewide concern. (Id. at pp. 23-24 [framing the issue as "whether the income tax burden on financial corporations, especially savings banksincluding the component imposed by municipalitiesis of sufficient extramural dimension to support legislative measures reasonably related to its resolution" (italics added)].)
Similarly, in Johnson, supra, 4 Cal.4th 389, our Supreme Court focused on the Legislature's purpose for enacting the state law at issue, which prohibited the public financing of statewide and local elections. Johnson discussed the several possible legislative purposes for the state law, including (1) regulating how local tax proceeds are expended; (2) preventing public financing of "`non-mainstream'" candidates; and (3) enhancing the integrity of the electoral process at the state and local levels. It concluded that the third of those possible legislative bases for enacting the lawenhancing the integrity of the electoral processreflected a statewide concern. (Id. at pp. 408, 409.) Johnson then proceeded to the second step of the analysis to determine whether the state law was reasonably related to achieving the goal of enhancing electoral integrity, and concluded that it was not. (Id. at pp. 410-411.)
*599 Here, the majority concludes that the prevailing wage law does not reflect a matter of statewide concern. However, in doing so, it conducts the wrong inquiry. According to the majority, the dispositive inquiry in determining the existence of a statewide concern is whether the policies supporting the prevailing wage law would be undermined if municipalities were not subject to the law. (Maj. opn., ante, at p. 593 [framing the inquiry as "whether the extraterritorial impact of a city's taxation or regulation as a practical matter interferes in a substantial way with a policy the Legislature is attempting to advance"]; ibid. [analyzing whether "the overall policy of the law would be undermined by a municipality's determination the [prevailing wage law] not apply to a particular project"].) Assuming, without expressly saying so, that the policy behind the prevailing wage law is the "stability of any regional labor market" (id. at p. 595), my colleagues determine that "the public works activities of a municipality are not likely to interfere in a material manner with the stability of any regional labor market" (id. at pp. 594-595), and that the record fails to establish that "municipal public works contracting has a material impact on [regional labor] markets" (id. at p. 596). My colleagues thus conclude that the prevailing wage law is not a matter of statewide concern.
This approach does not follow the analytical construct set forth in California Federal and Johnson. The majority's analysis does not focus on whether, in enacting the prevailing wage law, the Legislature was motivated by a statewide, or extramunicipal, concern. Instead, by inquiring whether the prevailing wage law has a substantial impact on the stability of the regional labor markets, my colleagues improperly perform an inquiry into the effectiveness and advisability of the prevailing wage law. Our Supreme Court in California Federal expressly advised against such an approach when it cautioned that "[t]he question is not whether the amendment [of the laws governing municipal taxation of savings banks] was prudent public policy or whether the municipal tax burden on savings banks has sufficient impact on the industry's financial health to make the change to a net income tax system an advisable or effective measure." (California Federal, supra, 54 Cal.3d at p. 23, italics added.)

B. The Majority's Reliance on Case Law Is Unpersuasive

My colleagues also conclude that the prevailing wage law is not a matter of statewide concern by relying on our Supreme Court's decision in City of Pasadena v. Charleville (1932) 215 Cal. 384, 389 [10 P.2d 745] (Charleville) and on other cases that they describe as having "consistently rejected application of the [prevailing wage law] to charter cities or other independent agencies." (Maj. opn., ante, at p. 591 [citing Vial v. City of San Diego (1981) 122 Cal.App.3d 346 [175 Cal.Rptr. 647] (Vial); Sonoma County Organization *600 of Public Employees v. County of Sonoma (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1] (Sonoma County); San Francisco Labor Council v. Regents of University of California (1980) 26 Cal.3d 785 [163 Cal.Rptr. 460, 608 P.2d 277] (San Francisco Labor Council); Regents of University of California v. Aubry (1996) 42 Cal.App.4th 579 [49 Cal.Rptr.2d 703] (Aubry)].) In my view, those authorities are not applicable here. Further, as I will explain, the authorities have not been "consistent[]" in their conclusions that the prevailing wage law is not a matter of statewide concern. [Maj. opn., ante, at p. 591.) Indeed, our own court's decision in Division of Lab. Stds. Enforcement v. Ericsson Information Systems, Inc. (1990) 221 Cal.App.3d 114 [270 Cal.Rptr. 75] (Ericsson) concluded that the prevailing wage law reflects a matter of statewide concern.

1. Charleville and Vial Are Not Controlling

The majority's reliance on Charleville is not persuasive. Charleville concluded that Pasadena, as a charter city, was not required to include a provision for payment of the general prevailing wage in its public works contract for the construction of a fence around a municipal reservoir, despite the Legislature's enactment of the predecessor to the current prevailing wage law, i.e., the Public Works Wage Rate Act of 1931 (Stats. 1931, ch. 397, §§ 2, 4, pp. 910, 911). (Charleville, supra, 215 Cal. at p. 393.) For several reasons, Charleville is no longer controlling authority on the issue of whether a charter city may exempt itself from compliance with the prevailing wage law.
First, Charleville is predicated on the assumption that the Legislature has limited authority to regulate the terms and conditions of private employment, including minimum wages. That assumption is no longer valid, as the constitutionality of general minimum wage laws is now beyond question. (See West Coast Hotel Co. v. Parrish (1937) 300 U.S. 379 [81 L.Ed. 703, 57 S.Ct. 578]; Cal. Const., art. XIV, § 1 ["The Legislature may provide for minimum wages and for the general welfare of employees ...."].) Thus, unlike in the era of Charleville, a court today considering whether the current prevailing wage law is based on a statewide concern may look to the Legislature's interest in regulating the terms and conditions of private sector employment and the functioning of private labor markets.[3]
*601 Second, in at least two important respects, the current prevailing wage law differs significantly from the Public Works Wage Rate Act of 1931 at issue in Charleville. The Public Works Wage Rate Act of 1931 required the public body awarding the contract to make its own determination of the general prevailing rate of per diem wages in its own locality.[4] In contrast, the current prevailing wage statute provides that California's Department of Industrial Relations determines prevailing wage rates based on statutory criteria, and those wage determinations cover an entire county or multicounty region. (§§ 1773, 1773.1, 1773.9.) In addition, the Public Works Wage Rate Act of 1931 did not contain any provisions relating to the hiring of apprentices or making contributions to apprentice training programs. (Stats. 1931, ch. 397, §§ 1-6, pp. 910-912; Whitsett, supra, 215 Cal. at pp. 404, 406.) In contrast, the current prevailing wage law contains extensive provisions concerning apprentice training including, among other things, that a public agency awarding a public works contract require that a certain percentage of the workers on the project be apprentices (§ 1777.5, subds. (b)-(d), (n)), and that contractors who employ workers in any apprenticeable trade on a public works project make monetary contributions to the California Apprenticeship Council or to an approved apprenticeship program (§ 1777.5, subd. (m)(1)).
Third, and finally, Charleville no longer appears to be controlling authority on the issue of whether a charter city may exempt itself from compliance with the prevailing wage law, as our Supreme Court recently described the exact issue as an "open" and "important" question. (City of Long Beach v. Department of Industrial Relations (2004) 34 Cal.4th 942, 947 [22 Cal.Rptr.3d 518, 102 P.3d 904].)
The majority also relies on Vial, supra, 122 Cal.App.3d 346, which held that the prevailing wage law did not apply to charter cities. However, Vial relied on Charleville as the sole basis for its analysis. Having concluded that Charleville does not control the issue of whether a charter city may exempt itself from compliance with the prevailing wage law, I conclude as well that Vial is no longer controlling authority. I further find Vial to be unpersuasive because its analytical approach is inconsistent with the approach later set out by our Supreme Court in California Federal, which focuses on the nature of *602 the state law at issue. (California Federal, supra, 54 Cal.3d at p. 17.) Instead of focusing on the nature of the state law, Vial incorrectly focused on whether "the projects in question are within the realm of `municipal affairs ....'" (Vial, at p. 348, italics added.)

2. Sonoma County and San Francisco Labor Council Are Not Applicable

My colleagues cite Sonoma County, supra, 23 Cal.3d 296, and San Francisco Labor Council, supra, 26 Cal.3d 785, in support of their conclusion that the prevailing wage law is not a matter of statewide concern. Those case are not applicable because they both deal with the Legislature's attempt to set the internal salaries of the public agencies at issue. Specifically, Sonoma County held that a charter city was exempt from general laws that would have set the compensation that a city pays its own employees by prohibiting certain cost of living increases for those employees. (Sonoma County, at pp. 314-318.) Sonoma County relied on a constitutional provision giving "`plenary authority' to cities to provide in their charters for the compensation of their employees" (id. at p. 316, citing Cal. Const., art. XI, § 5, subd. (b)), and thus concluded that "the salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws" (Sonoma County, at p. 317). San Francisco Labor Council concluded that because of the home rule provision applicable to the University of California (Cal. Const., art. IX, § 9), the university was not required to comply with a provision in the Education Code requiring that it ascertain and follow minimum and maximum salary limits for its own employees.[5]
Here, we are not concerned with the Legislature's attempt to regulate the salaries paid by a municipality to its own employees. Were that so, I would rely on the constitutional provision cited in Sonoma County to conclude that Vista has plenary authority to set the salary of its own employees. Instead, the prevailing wage law concerns (1) the wages that must be paid by private contractors to the workers it hires to fulfill public works contracts and (2) the provisions concerning apprentice training that must be followed by those private contractors. Although public funds are involved in Vista's contracting for its public works projects, public employment is not.

*603 3. This Court's Decision in Ericsson, Which the Majority Does Not Follow, Is More Persuasive than Aubry
The majority cites Aubry, supra, 42 Cal.App.4th 579, in which the Second District held that because of the home rule provisions applicable to the University of California, the prevailing wage law does not apply to it. However, the majority gives no weight to an opposite decision by our own court. In Ericsson, supra, 221 Cal.App.3d 114, this court concluded that "the protection afforded private sector employees working on public projects is a matter of statewide concern and accordingly the public works prevailing wage laws are applicable to the university." (Id. at p. 124, italics added.)
I would follow Ericsson as the more persuasive authority. Ericsson convincingly identified the "interest in state control to ensure consistency in wage levels" as the statewide concern behind the Legislature's enactment of the prevailing wage law.[6] (Ericsson, supra, 221 Cal.App.3d at p. 124.) Aubry, in contrast, relied on San Francisco Labor Council, supra, 26 Cal.3d 785, for its conclusion that the prevailing wage law is not a matter of statewide concern. However, as already discussed, San Francisco Labor Council does not control whether the prevailing wage law is a matter of statewide concern, as it dealt with a statute regulating the University of California's own employees.

C. Applying the Proper Inquiry to the Facts in the Record, the Prevailing Wage Law Is a Matter of Statewide Concern, Has a Reasonable Relation to the Legislature's Goals in Enacting It and Is Narrowly Tailored

Applying the proper inquiry set forth in California Federal and Johnson, I conclude that the prevailing wage law is a matter of statewide concern, has a reasonable relation to the Legislature's goals in enacting it and is narrowly tailored.

*604 1. The Legislative Purpose of the Prevailing Wage Law

As discussed above, under the approach set forth by our Supreme Court, the first analytical step in mediating jurisdictional disputes between conflicting state and charter city laws is to determine whether the Legislature's purpose in enacting the prevailing wage law reflects a matter of statewide concern. To undertake this analysis, a court must determine the Legislature's purpose in enacting the law.
Although a court may not accept, without question, the Legislature's statement that a law constitutes a matter of statewide concern, a court may focus on the Legislature's statements when attempting to ascertain the legislative purpose for the law. Although "the Legislature is not the final arbiter as to what constitutes a matter of statewide concern ..." (Sonoma County, supra, 23 Cal.3d at p. 316), we may give "`great weight' to legislative statements of purpose" (California Federal, supra, 54 Cal.3d at p. 24, fn. 21).
In several recent enactments amending the prevailing wage law, the Legislature has explained the purpose for the prevailing wage law. It declared: (1) "Payment of the prevailing rate of per diem wages to workers employed on public works is necessary to attract the most skilled workers for the project and to ensure that work of the highest quality is performed on these projects"; and (2) "Public works projects should never undermine the wage base in a community and requiring that workers on public works projects be paid the prevailing rate of per diem wages ensures that the wage base is not lowered." (Stats. 2002, ch. 868, § 1(a), (b); see also Stats. 2002, ch. 892, § 1(a)(1), (2); Stats. 2003, ch. 851, § 1(a)(1), (2).) Further, in a concurrent resolution passed in 2003, the Legislature stated, among other things, that (1) "[t]he state's system for promoting quality apprenticeship training in the construction trades depends upon the incentives provided by the prevailing wage law ...," and (2) "the requirement that workers on public works projects be paid the prevailing rate of per diem wages ensures that the local wage base is not lowered." (Sen. Conc. Res. No. 49 (2003-2004 Reg. Sess.).)
Based on these legislative statements, the prevailing wage law appears to have three fundamental purposes: (1) ensuring that public projects are of the highest quality; (2) maintaining the wage base in the state's construction industry; and (3) promoting quality apprentice training in the construction trades. SBCTC argues that two of these purposes evidence statewide concerns. "First, the prevailing wage law addresses a concern with making construction work an occupation that provides decent wages and benefits. It addresses that concern by preventing public projects from driving down area *605 labor standards." "Second, the prevailing wage law addresses a concern with training the next generation of skilled construction workers by requiring contractors on public projects to hire apprentices."
In my view, using the proper legal construct, the record establishes that the legislative purposes of (1) maintaining the wage base in the construction industry and (2) promoting quality apprentice training in the construction trades are both matters of statewide concern and, further, that the prevailing wage law is reasonably related to advancing those purposes. I explain my rationale as follows.

2. The Legislative Purpose of Maintaining the Construction Industry's Wage Base Is a Matter of Statewide Concern, and the Prevailing Wage Law Is Reasonably Related to Addressing That Concern

a. Statewide Concern

In accordance with our Supreme Court's directive in California Federal and Johnson, I first analyze whether the legislative goal of maintaining the construction industry's wage base reflects a matter of statewide concern.
Our Supreme Court has clarified that when determining whether the legislative purpose for a law reflects a matter of statewide concern, the term "`statewide' refers to all matters of more than local concern and thus includes matters the impact of which is primarily regional rather than truly statewide." (Committee of Seven Thousand v. Superior Court (1988) 45 Cal.3d 491, 505 [247 Cal.Rptr. 362, 754 P.2d 708] (Committee of Seven Thousand).) Thus, we must inquire whether the purposes behind the state law are "of sufficient extramural dimension" and reflect "extramunicipal concerns." (California Federal, supra, 54 Cal.3d at pp. 24, 18.) In general, "`municipal action which affects persons outside of the municipality becomes to that extent a matter which the state is empowered to prohibit or regulate ....'" (Committee of Seven Thousand, at p. 505.)
The legislative purpose of maintaining the wage base in the construction industry has an extramunicipal dimension because it focuses on preserving a wage base that is regional in nature, not merely municipal. As the majority acknowledges, the record establishes that markets for construction labor cover more than the boundaries of a single city, and wages and benefits are set based on collective bargaining agreements that cover regional areas rather than cities. Further, as SBCTC's president Robert Balgenorth explains, the prevailing wage law serves to maintain the level of wages in the construction industry because "[a]bsent the prevailing wage law, union-signatory contractors would have difficulty competing for work on public projects, which often *606 must be awarded to the lowest bidder. That would lead to downward pressure on construction wages and benefits throughout the labor-market area, because union-signatory contractors would seek concessions to remain competitive on public work." Thus, in focusing on efforts to preserve the construction industry wage base through the prevailing wage law, the Legislature was focused on the goal of preserving wages throughout a region, rather than merely within the boundaries of a municipality. In short, because the labor market area for the construction industry is regional, and not merely confined to a single city, the downward pressure that the prevailing wage law seeks to prevent is an extramunicipal concern.
The majority ignores the portion of Balgenorth's declaration quoted above, which, while not expansive, is uncontradicted and is sufficient to establish that the prevailing wage law seeks to maintain the level of wages in regional labor markets rather than merely in municipalities.[7] Our Supreme Court has instructed that in analyzing whether a statute reflects an issue of statewide concern we must resolve any doubts in favor of the applicability of the state law. (California Federal, supra, 54 Cal.3d at p. 24 [although "`[t]here must always be doubt whether a matter ... is of sufficient statewide concern ...'" to justify intrusion into an otherwise municipal affair, "`[s]uch doubt ... "must be resolved in favor of the legislative authority of the state"'"].) I would resolve any doubts created by the lack of an extensive record in this case in favor of finding that the legislative purpose of preserving the construction industry's wage base is a matter of statewide concern.[8]

*607 b. Reasonably Related

Having concluded that the legislative purpose of maintaining the construction industry's wage base is a statewide concern, I next consider whether the record supports the conclusion that the provisions of the prevailing wage law are reasonably related to advancing that legislative purpose. (California Federal, supra, 54 Cal.3d at p. 17 [considering whether "the statute is reasonably related to [the] resolution ..." of the Legislature's statewide concern in enacting the law].)
The resolution of that inquiry flows plainly from the facts and reasoning already set forth above. As Balgenorth explains, the prevailing wage law promotes the goal of maintaining the construction industry's wage base because it permits union-signatory contractors to submit competitive bids for public works projects, and thus it avoids the situation in which union-signatory contractors are forced to seek wage concessions in collective bargaining agreements so that they can compete with nonunion contractors in bidding on public works projects. Based on that evidence, I would conclude that the prevailing wage law is reasonably related to achieving the legislative purpose of maintaining the construction industry's wage base.

3. The Legislative Purpose of Promoting Quality Apprentice Training Is a Matter of Statewide Concern and the Prevailing Wage Law Is Reasonably Related to Addressing That Concern

a. Statewide Concern

The second legislative purpose underlying the prevailing wage law identified by SBCTC is to promote quality apprentice training in the construction industry. The first step in the analytical inquiry with respect to that legislative purpose is to determine whether it reflects a matter of statewide concern.
Because the majority does not detail the provisions of the prevailing wage law relating to apprentice training, I begin my discussion with a review of those provisions. First, the prevailing wage law contains provisions concerning the hiring of apprentices on public works projects. Specifically the law requires, subject to certain exceptions, that contractors working on public works projects hire a certain ratio of apprentices on the project (§ 1777.5, *608 subds. (b)-(d), (n)), and contractors may pay those apprentices a reduced apprentice wage if the apprentices are enrolled in a state-approved training program (id., subd. (c)). Second, the prevailing wage law requires that contractors who employ workers in any apprenticeable trade on a public works project make monetary contributions to the California Apprenticeship Council or to a state-approved apprentice training program in "the same amount that the director [of the Department of Industrial Relations] determines is the prevailing amount of apprenticeship training contributions in the area of the public works site." (Id., subd. (m)(1).) The funds received by the California Apprenticeship Council are distributed as grants to state-approved apprentice training programs. (Id., subd. (m)(2).) Public works contracts must contain provisions requiring compliance with these aspects of the prevailing wage law. (Id., subd. (n).)
The state has long been involved in the area of apprentice training in the construction industry through the Shelley-Maloney Apprentice Labor Standards Act of 1939 (the Shelley-Maloney Act), which is codified as section 3070 et seq. (See Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council (1992) 4 Cal.4th 422, 433 [14 Cal.Rptr.2d 491, 841 P.2d 1011] (Associated Builders).) Pursuant to the Shelley-Maloney Act, apprentice training in the construction industry is administered by the Division of Apprenticeship Standards of the Department of Industrial Relations (the Division) and through the California Apprenticeship Council within the Division. (Associated Builders, at p. 433; see also §§ 3070-3073.) The California Apprenticeship Council meets at least quarterly and issues rules and regulations that establish apprenticeship standards, equal opportunity and affirmative action requirements for apprenticeship programs, and criteria for selection procedures for apprentices. (§ 3071; Associated Builders, at p. 433.) "The goals of California's regulatory scheme are to `foster, promote, and develop the welfare of the apprentice and industry, improve the working conditions of apprentices, and advance their opportunities for profitable employment....'" (Associated Buil. and Contrac., Sout. Cal. v. Nunn (9th Cir. 2004) 356 F.3d 979, 982, quoting § 3073.) "California fulfills these goals by offering a variety of incentives to encourage apprenticeship programs to seek state approval, which can be obtained if the programs comply with specified state standards[, including] direct financial assistance ...." (Nunn, at p. 982, citing § 3074 & Cal. Code Regs., tit. 8, § 212.)[9] "[A]n apprentice who completes an approved training program obtains a certificate *609 of completion ..." from the Division "naming him or her a skilled journeyman in the chosen trade." (Associated Builders, supra, 4 Cal.4th at p. 429, citing Cal. Code Regs., tit. 8, § 224.)
As reflected by our Supreme Court's decision in California Federal, a court may rely on the state's comprehensive regulation of an area to determine that legislation pertaining to that area was motivated by a matter of statewide concern. In California Federal, the court determined that "because the comprehensive regulation of savings banks takes place almost entirely at state and federal levels," the Legislature's purpose in enacting the state law at issue, which regulated municipal taxation of savings banks, reflected a statewide concern. (California Federal, supra, 54 Cal.3d at p. 23.) Here, based on the state's comprehensive regulation of apprentice training programs through the Shelley-Maloney Act, I conclude that in enacting the prevailing wage law with the purpose of promoting quality apprentice training in the construction industry, the Legislature was motivated by a matter of longstanding statewide concern.
My conclusion that the apprentice training provisions of the prevailing wage law reflect a matter of statewide concern is buttressed by our Supreme Court's teaching that when the Legislature is motivated by "matters of more than local concern" that are "primarily regional," the law at issue reflects a matter of statewide concern. (Committee of Seven Thousand, supra, 45 Cal.3d at p. 505.) Here, as Balgenorth explains, apprentice training programs in the construction industry cover county or multicounty areas, and when apprentices complete the training programs, they enter regional labor markets. Thus, in aiming to promote apprentice training in the construction industry, the Legislature was focused on promoting regional training programs and in furthering the education and training of a regional workforce. The regional focus of the apprentice training programs indicates that Legislature was motivated by a statewide concern in enacting the apprentice training provisions of the prevailing wage law.

b. Reasonably Related

Having determined that the apprentice training provisions in the prevailing wage law reflect a matter of statewide concern, the next analytical step is to determine whether those provisions are reasonably related to the legislative goal of promoting quality apprentice training in the construction industry. (California Federal, supra, 54 Cal.3d at p. 17.) Three aspects of the law convince me that they are.
First, the portion of the prevailing wage law requiring that contractors hire a certain ratio of apprentices on public works projects advances the legislative *610 goal of promoting quality apprentice training because it ensures that there will be on-the-job training opportunities for workers enrolled in the training programs. As Balgenorth explains, apprentice training programs are a combination of on-the-job training and classroom work, and the prevailing wage law "provides employment for apprentices so they can obtain the necessary on-the-job training in a variety of work processes to graduate from the [apprentice training] programs."
Second, as Balgenorth explains, the requirement that contractors on public works projects make monetary contributions to the California Apprenticeship Council or to a state-approved apprentice training program "supports the apprenticeship system" because it requires employers to contribute to the cost of the training programs and thus strengthens them. Balgenorth points out that given the mobile nature of the construction industry workforce, contractors would be reluctant to invest the resources in training an apprentice for a multiyear period if not for the mandate provided by the prevailing wage law.
Third, and finally, the prevailing wage law specifically advances the legislative goal of promoting quality apprentice training programs because under the law (1) contractors' monetary contributions go toward state-approved programs, which, by definition, meet the standards for quality set by the Division; and (2) contractors are permitted to pay the reduced apprentice wage on public works projects only for apprentices in state-approved training programs, which has the effect of promoting those programs that meet the Division's quality standards.
Based on all of these considerations, I would conclude that the prevailing wage law is reasonably related to the goal of promoting quality apprentice training in the construction industry.

4. The Prevailing Wage Law Is Narrowly Tailored

Applying the final step of the analytical construct set forth in California Federal and Johnson, I would conclude that the prevailing wage law is "`narrowly tailored' to limit incursion into legitimate municipal interests." (Johnson, supra, 4 Cal.4th at p. 404.) Here, the legitimate municipal interest identified by Vista is its control of its own fiscal affairs. (See id. at p. 407 ["`how a city's tax dollars will be spent'" is a significant municipal concern].)[10] Thus, I specifically focus on whether the prevailing wage law is narrowly tailored to limit fiscal impacts on municipalities.
*611 One way in which the prevailing wage law may have a fiscal impact on municipalities is through the provisions requiring contractors on public works projects to pay the prevailing wage. As Vista asserts, the payment of the prevailing wage might drive up the cost of a public works contract because labor costs will be higher. I conclude, however, that the Legislature narrowly tailored this aspect of the prevailing wage law to minimize the fiscal impact on municipalities in that the law provides objective and well-defined statutory criteria to determine the prevailing wage in the applicable regional labor market. As set forth in the statute, the Director of Industrial Relations establishes the prevailing wage by, among other things, "ascertain[ing] and consider[ing] the applicable wage rates established by collective bargaining agreements and the rates that may have been predetermined for federal public works, within the locality and in the nearest labor market area." (§ 1773.) Based on this data, "[t]he rate fixed for each craft, classification, or type of work shall be not less than the prevailing rate paid in the craft, classification, or type of work." (Ibid.) By requiring that contractors on public works projects pay wages that are tied specifically to wages already paid in the relevant regional labor markets, the law endeavors to keep the labor costs as low as possible while still addressing the legislative goal of preserving the construction industry's wage base. Through its well-designed method for setting the prevailing wage rates, the statute is thus narrowly tailored to minimize the fiscal impact on municipalities.
Another provision in the prevailing wage law that might impact the cost of public works contracts is the provision requiring contractors to make monetary contributions to apprentice training programs. However, that portion of the law is also narrowly tailored to minimize the fiscal impact on municipalities. The prevailing wage law requires contractors on public works to make monetary contributions for apprentice training programs, but states that a contractor's required contribution amount shall be "the same amount that the director determines is the prevailing amount of apprenticeship training contributions in the area of the public works site." (§ 1777.5, subd. (m)(1).) In this way, the Legislature minimized the cost associated with the apprentice training provisions of the prevailing wage law in that contractors are required to contribute no more than is necessary to ensure that all contractors equitably share the burden of training the next generation of workers. In my view, the law is thus narrowly tailored to minimize any fiscal impact on municipalities.

*612 D. Conclusion

Having concluded that the prevailing wage law is one of statewide concern based on the legislative purpose of (1) maintaining the wage base in the construction industry and (2) promoting quality apprentice training, and having concluded that the prevailing wage law is reasonably related to advancing these legislative goals and is narrowly tailored, I would conclude that, despite its status as a charter city, Vista may not exempt itself from compliance with the prevailing wage law.
NOTES
[1] Vance and Geldert were sued in their official capacities only. Unless otherwise indicated, any reference to Vista includes Vance and Geldert.
[2] All further statutory references are to the Labor Code unless otherwise specified.
[3] To comply with the PWL, Vista's agreements with the contractors constructing its public works projects would have to contain provisions, among others: (1) specifying the "general rate of per diem wages" for each applicable type of worker or referencing the fact that the schedule of prevailing wages is on file at the city's offices (§ 1773.2); (2) requiring that the contractors hire apprentices (§ 1777.5, subds. (d), (n)); and (3) requiring that the contractors maintain certified payroll records showing the per diem wages paid to workers on the projects (§ 1776, subds. (a), (b)). No such provisions appear in the contracts for the construction of Vista's two new fire stations.
[4] At the time of the trial court's ruling, the record contained evidence that Vista had approved contracts with a design-build contractor for the two new fire stations. To update the status of the construction projects, SBCTC has submitted to us a resolution of the Vista city council and a Vista press release, both of which show that construction is proceeding on the fire stations, along with a request that we take judicial notice of those documents. SBCTC's request for judicial notice of those items is unopposed, and we grant the request. The same request for judicial notice also contains (1) a California Assembly floor analysis; (2) official California ballot materials; and (3) a decision by the Commission on State Mandates, all of which relate to other issues in the litigation. The request for judicial notice of those items also is unopposed, and we grant the request because the documents at issue are all proper subjects of judicial notice under Evidence Code section 459. Vista has filed an unopposed request that we take judicial notice of (1) two decisions of the Department of Industrial Relations and (2) the text of two Senate bills. These documents are also proper subjects for judicial notice, and we hereby grant the request.
[5] The court in Johnson v. Bradley did accept the opponents' contention that electoral integrity is a matter of statewide concern. (Johnson v. Bradley, supra, 4 Cal.4th at p. 409.) However, as required by its holding in California Federal, the court then considered whether the ban on public financing of elections was reasonably related to the state's interest in promoting electoral integrity. In finding no reasonable relation between the ban and preventing political corruption, the court agreed with the Court of Appeal that: "`[T]he use of public funds for campaign financing will not, almost by definition, have a corrupting influence.'" (Id. at p. 410.) Having found no reasonable relation between the statewide concern for enhancing the integrity of the electoral process and the ban on public financing, the court found that it did not need to "address whether the statute is also narrowly tailored to avoid unnecessary incursion into legitimate areas of local concern." (Id. at p. 411.)
[6] Section 1773 further provides: "Where the rates do not constitute the rates actually prevailing in the locality, the director shall obtain and consider further data from the labor organizations and employers or employer associations concerned, including the recognized collective bargaining representatives for the particular craft, classification, or type of work involved. The rate fixed for each craft, classification, or type of work shall be not less than the prevailing rate paid in the craft, classification, or type of work."
[7] As the court in State Building & Construction Trades Council of California v. Duncan noted, following McIntosh v. Aubry and at the instance of the SBCTC, the Legislature amended the PWL to, among other matters, provide that rent subsidies qualified as expenditures of public funds under the PWL. (State Building & Construction Trades Council of California v. Duncan, supra, 162 Cal.App.4th at pp. 309-310.)
[8] Like the dissent, in Regents of University of California v. Aubry the Department of Industrial Relations relied on our opinion in Division of Lab. Stds. Enforcement v. Ericsson Information Systems, Inc. (1990) 221 Cal.App.3d 114 [270 Cal.Rptr. 75] (Ericsson) for the proposition that the PWL was a matter of statewide concern. The court in Regents of University of California v. Aubry considered Ericsson and found it distinguishable: "In Ericsson, a UC contract called for a private contractor installing a telephone system in an existing UC building to pay prevailing wages, but UC did not specify what those wages were nor did the contractor actually pay prevailing wages. The Department sought to compel payment of prevailing wages. The court held: `As to this contract, UC[] is not exempt from the public works prevailing wage laws.' [Citation.] The holding was based on both the contractual prevailing wage requirement and the fact that the particular contract did not involve internal UC affairs. The opinion's opening paragraph stated: `We hold [UC] is subject to the public works prevailing wage laws designed to protect private sector employees on public works which do not involve the internal affairs of [UC].' [Citation.] Thus, Ericsson does not stand for the proposition that the prevailing wage law is always of statewide concern." (Regents of University of California v. Aubry, supra, 42 Cal.App.4th at p. 590.) We agree with the court in Regents of University of California v. Aubry: our opinion in Ericsson does not establish that the PWL is a matter of statewide concern, where, as here, an independent agency has decided not to impose its requirements on public works contractors.
[9] We of course recognize that we must give deference to economic determinations of the Legislature. (California Federal, supra, 54 Cal.3d at p. 24.) However, notwithstanding such deference, application of article XI, section 5, is a judicial function which requires that we exercise our "independent judgment." (54 Cal.3d at p. 24, fn. 21.)
[10] Although we do not reach the question of whether the PWL is narrowly tailored to avoid unnecessary incursion into legitimate areas of local concern, the fact that the Legislature itself has been able to tailor the PWL so that the statute does not hinder competing policy interests identified by the Legislature would be relevant in considering whether blanket application of the PWL to all local public works projects is necessary to meet the policy goals of the PWL.
[11] The Legislature was referring to the Court of Appeal opinion in City of Long Beach v. Department of Industrial Relations, which was superseded by the opinion in City of Long Beach v. Department of Industrial Relations, supra, 34 Cal.4th 942.
[12] Moreover, we need not and do not reach Vista's alternative contention the PWL is an unfunded mandate within the meaning of California Constitution, article XIIIB, section 6.
[1] Unless otherwise indicated, all further statutory references are to the Labor Code.
[2] As our Supreme Court has explained, before undertaking an analysis as to whether a charter city is required to follow a conflicting state law, a court must first satisfy itself that there is an actual conflict between the state law and the municipal law. (California Federal, supra, 54 Cal.3d at p. 16.) I agree with my colleagues that in this case an actual conflict exists.
[3] Our Supreme Court has recognized that "the `constitutional concept of municipal affairs... changes with the changing conditions upon which it is to operate. What may at one time have been a matter of local concern may at a later time become a matter of state concern controlled by the general laws of the state.'" (Bishop v. City of San Jose (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137].) This observation applies equally to changes in the underlying legal landscapesuch as the constitutionality of minimum wage lawswhich may impact whether a law reflects a matter of statewide concern.
[4] According to law applicable when Charleville was decided, "`[t]he public body awarding any contract for public work ... shall ascertain the general prevailing rate of per diem wages in the locality in which the work is to be performed ..., and shall specify in the call for bids for said contract, and in the contract itself, what the general prevailing rate of per diem wages in the said locality is for each craft or type of workman needed to execute the contract....'" (Metropolitan Water Dist. v. Whitsett (1932) 215 Cal. 400, 404 [10 P.2d 751], quoting the Public Works Wage Rate Act of 1931 (Whitsett).) The law provided that "`[t]he term "general prevailing rate of per diem wages" shall be the rate determined upon as such rate by the public body awarding the contract, or authorizing the work, whose decision shall be final ....'" (Whitsett, at p. 406.)
[5] The majority quotes San Francisco Labor Council's statement that "our recent decision in Sonoma County ... leads us to conclude a prevailing wage requirement is not a matter of statewide concern." (San Francisco Labor Council, supra, 26 Cal.3d at p. 790.) Although this statement refers generally to "a prevailing wage requirement," our Supreme Court plainly was not considering whether the prevailing wage law at issue here (i.e., §§ 1720-1780) is a matter of statewide concern, but instead was referring to very different statutes that set wages for University of California and municipal employees.
[6] Unlike in the case of a charter city, under the home rule provision applicable to the University of California, the university is required to follow a conflicting state law if two separate requirements are met: (1) the law reflects a matter of statewide concern, and (2) the law does not involve the internal affairs of the university. (San Francisco Labor Council, supra, 26 Cal.3d at p. 789.) Applying this approach, Ericsson concluded that the prevailing wage law "does not involve the university's internal affairs and is a matter of statewide concern." (Ericsson, supra, 221 Cal.App.3d at p. 123, italics added.) Both Aubry and my colleagues appear to suggest that Ericsson is distinguishable because it based its decision, in part, on the finding that the university's internal affairs were not implicated by the application of the prevailing wage law. I find the reasoning of Aubry and my colleagues to be wholly unconvincing. In Ericsson, the question of whether the university's internal affairs were implicated was treated as analytically separate from the question of whether the prevailing wage law was a matter of statewide concern.
[7] Significantly, Vista did not attempt to challenge Balgenorth's explanation of how the prevailing wage law seeks to address the level of wages in regional labor markets and submitted no evidence to the contrary.
[8] Not only do my colleagues disregard Balgenorth's statements, they make an unwarranted factual assumption that, in my view, has no basis in the record or in fact. Without citation to any evidence in the record, and based on an unwarranted assumption about the low percentage of construction projects that are publicly financed, my colleagues conclude that in the absence of a prevailing wage law "the public works activities of a municipality are not likely to interfere in a material manner with the stability of any regional labor market." (Maj. opn., ante, at pp. 594-595.) However, statistics show that public construction represents approximately one-quarter of the total construction dollars spent in the United States. (Petersen & Godtland, Benefits vs. Wages: How Prevailing Wage Laws Affect the Mix and Magnitude of Compensation to Construction Workers in The Economics of Prevailing Wage Laws (Azari-Rad et al. edits., 2005) p. 192, citing U.S. Bureau of Census, Statistical Abstract of the United States, 2002.) Economists have concluded that prevailing wage laws have a substantial impact on the level of wages in the construction industry. (Petersen & Godtland, supra, at p. 191 [concluding that "compensation levels to construction workers are significantly higher under prevailing wage laws"].) I acknowledge that economists and policy makers might reach different conclusions about the efficacy of prevailing wage laws, as such laws often have been the subject of political controversy. (Azari-Rad et al., Introduction: Prevailing Wage Regulations and Public Policy in the Construction Industry in The Economics of Prevailing Wage Laws, supra, pp. 16-19 [describing the current debate over the advisability of prevailing wage laws].) However, the advisability of passing the prevailing wage law in an attempt to maintain the wage base in the construction industry is not a question for judicial resolution, but rather is a policy question properly left to the Legislature. (See California Federal, supra, 54 Cal.3d at p. 23 [the proper inquiry for the court is not whether the state law at issue is "an advisable or effective measure"].) For the purposes of a court's analysis, it is sufficient that the prevailing wage law is reasonably related to advancing the goal set by the Legislature. As I will explain, the record establishes that the law is reasonably related to advancing the Legislature's goals.
[9] "An apprenticeship program in California may be sponsored by an individual employer, an individual labor union, a group of employers, a group of labor organizations, or by a joint management-labor venture (a so-called joint apprenticeship committee)." (California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc. (1997) 519 U.S. 316, 321 [136 L.Ed.2d 791, 117 S.Ct. 832], citing § 3075.) An apprentice training program must comply with a detailed list of specifications to obtain state approval. (Associated Builders, supra, 4 Cal.4th at p. 434, citing Cal. Code Regs., tit. 8, § 212.)
[10] The majority places great weight on our Supreme Court's statement in Johnson (quoting the Court of Appeal) that "`[w]e can think of nothing that is of greater municipal concern than how a city's tax dollars will be spent ....'" (Johnson, supra, 4 Cal.4th at p. 407.) But as shown by the discussion in Johnson, this observation is the start of the analysis, not the end of it. Vista unquestionably has a great interest in how its tax dollars are spent. However, the question in this case is whether the prevailing wage law, which conflicts with that municipal interest, takes precedence over it.